The PEOPLE of the State of Colorado, Petitioner,

v.

Diane Ruth SPORLEDER, Respondent.

No. 81SC233.

Supreme Court of Colorado,
En Banc.

June 27, 1983.

Alexander M. Hunter, Dist. Atty., Randall J. Paulsen, Richard F. Good, Deputy Dist. Attys., Boulder, for petitioner.

James B. Breese, Marna Mel Lake, Legal Aid and Defender Program, University of Colorado School of Law, Boulder, for respondent.

QUINN, Justice.

We granted certiorari to review an order of the Boulder District Court affirming the ruling of the Boulder County Court which suppressed evidence obtained by the use of a pen register. The district court reasoned that under Article II, Section 7 of the Colorado Constitution a telephone subscriber has a legitimate expectation that information relating to telephone numbers dialed on a home telephone will remain private and that in the absence of exigent circumstances law enforcement officers must obtain a search warrant supported by probable cause prior to the installation of a pen register. We affirm the order of the district court.

## I.

The defendant, Diane Ruth Sporleder, was charged in the Boulder County Court with several misdemeanor counts of harassment by telephone, section 18–9–111(1)(f), C.R.S.1973 (1978 Repl.Vol. 8).[1] The defendant filed a motion to suppress the records of

---

**1.** Section 18–9–111(1)(f), C.R.S.1973 (1978 Repl.Vol. 8), states:

"(1) A person commits harassment if, with intent to harass, annoy, or alarm another person, he:

\* \* \* \* \* \*

(f) Makes a telephone call or causes a telephone to ring repeatedly, whether or not a conversation ensues, with no purpose of legitimate conversation."

Although the record does not contain the charging documents filed in the county court, the transcript of the suppression hearing indicates that the charges arose out of telephone calls allegedly placed by the defendant in May of 1980.

all telephone numbers dialed by her which were obtained by the installation of a pen register. A hearing was held on the defendant's motion to suppress and the following facts were established.

In October of 1979 Mountain Bell Telephone Company (Mountain Bell) received several complaints alleging that the defendant had made a series of harassing telephone calls. Robert Sprouse, Mountain Bell's Security Manager, called the defendant and advised her of the complaints, but she denied being the source of the calls. The record does not indicate that Sprouse took any further action at that time.

Later, in February of 1980, the Boulder District Attorney's Office received a complaint in the form of a sworn affidavit from Robert L. Finch, an attorney in Farmington, New Mexico. Finch stated that he and his law partner had received a series of anonymous, annoying telephone calls at their office and homes. According to the affidavit, once the telephone was answered the caller would hang up immediately. Finch's affidavit continued:

> "By coincidence I have discovered that a client of mine, Mr. Dudley Pounders, had endured these types of calls for months. The source of the telephone calls has been identified by Mountain Bell employees as coming from the residence of Diane Ruth Spoleder [sic], 1604 Sunset, Louisville, Colorado. This office represented Mr. Pounders in a particularly acrimonious divorce action with Ms. Spoleder [sic] and is currently handling another matter between the parties. Additionally, other attorneys in this locale who formerly represented Ms. Spoleder [sic] are receiving similar calls. The pattern with all calls to all individuals is identical."

In the meanwhile Mountain Bell continued to receive complaints of abusive telephone calls. Security Manager Sprouse contacted James Smith, Chief Investigator for the Boulder District Attorney's Office,

and was assured that the district attorney's office was "handling the case" and would keep Sprouse advised. On April 24, 1980, Sprouse again called Smith to determine the status of the investigation. Smith at this time initially requested Sprouse to disconnect the defendant's telephone, but later they both decided to conduct a joint "deterrent interview" with her and they accordingly telephoned her at home on that date. When she answered the telephone, Sprouse identified himself and warned her that if the calls continued her telephone service would be disconnected. The defendant denied making any harassing telephone calls, at which point Smith revealed his presence on the line and warned her that criminal charges could be filed. The following day Mountain Bell sent the defendant a follow-up letter advising her that it knew of her harassing telephone calls, that "Mr. Jim Smith of the Boulder District Attorney's Office is also aware of this situation," and that "if we are notified that you have made one more call to harass or threaten any of the [complainants] your telephone service will be terminated immediately."

On May 8, 1980, a pen register was installed on the defendant's home telephone. A pen register is a mechanical device that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial on the telephone is released, without, however, recording or monitoring the telephone conversation.[2] The pen register was installed at the office of Mountain Bell and recorded the date, time and telephone number of the calls from the defendant's telephone. The tape of the pen register indicated that between May 9 and May 16 several telephone numbers listed to the persons who had previously complained of harassing calls were dialed from the defendant's telephone.

At the close of the evidentiary hearing on the motion to suppress the county court continued the matter for briefs and legal argument. The People filed a brief chal-

**2.** See Smith v. Maryland, 442 U.S. 735, 736, n. 1, 99 S.Ct. 2577, 2578, n. 1, 61 L.Ed.2d 220, 224, n. 1 (1979); United States v. New York Telephone Co., 434 U.S. 159, 161, n. 1, 98 S.Ct. 364, 366–67, n. 1, 54 L.Ed.2d 376, 382, n. 1 (1977); Hodge v. Mountain Bell Telephone and Telegraph Co., 555 F.2d 254, 255, n. 1 (9th Cir. 1977).

lenging the defendant's suppression motion on the single ground that the defendant had no legitimate expectation of privacy in the telephone numbers dialed by her on her telephone. During the subsequent legal argument before the county court, the court expressly inquired of the deputy district attorney whether the prosecution was contending that there was a lack of any governmental action in this case. The deputy district attorney responded that the prosecution's basic contention was that a telephone user had no legitimate expectation of privacy in telephone numbers dialed by her. The county court granted the motion to suppress the evidence obtained from the use of the pen register, ruling that in the absence of exigent circumstances, Article II, Section 7 of the Colorado Constitution requires law enforcement officials to obtain a search warrant in order to install a pen register on a suspect's telephone.

The People appealed this ruling to the Boulder District Court, arguing that because the defendant had no legitimate expectation of privacy in the telephone numbers dialed by her, the installation of the pen register implicated no right under the Colorado Constitution. The district court, also noting that "[t]he presence of governmental action is not contested," affirmed the suppression ruling of the county court and concluded, in pertinent part, as follows:

"Although the state has a legitimate interest in maintaining public order, the telephone subscriber has a legitimate privacy interest in the records of telephone calls made from [her] own home. Before the state is permitted to search or create these records by means of a pen register, a search warrant must be issued upon a showing of probable cause. The pen register search of defendant Sporleder's telephone was conducted without a warrant and is therefore violative of Article II, Section 7 of the Colorado Constitution. Accordingly, the suppression of the pen register tapes is affirmed."

The People's principal argument before this court is that the defendant had no legitimate expectation of privacy in the telephone numbers she dialed and, hence, the use of the pen register to obtain that information was not an unconstitutional search and seizure in violation of Article II, Section 7 of the Colorado Constitution. Alternatively, the People argue that even if the defendant's privacy expectation was a legitimate one, the installation of a pen register should be authorized on a standard less than the probable cause required for a search warrant. Before considering these arguments, it is necessary that we address the threshold matter of state action.

## II.

The People contend that there was no state action in the installation of the pen register and, therefore, no violation of the defendant's constitutional rights. Although the record suggests an ongoing joint investigation by the district attorney's office and Mountain Bell during the period when the pen register was installed on the defendant's telephone line, we need not determine here whether the interactions between the district attorney's office and Mountain Bell were sufficient to render the telephone company a "state agent" for purposes of the constitutional protection against unreasonable searches and seizures.[3] *See Lustig*

---

3. In *Smith v. Maryland, supra* note 2, the pen register was installed, and the numbers recorded, by the telephone company. Because, however, the telephone company acted at police request and because the government appeared to concede that the company should be deemed an agent of the police for purposes of state action, the United States Supreme Court assumed that " 'state action' was present here." *Id.* at 735, n. 4, 99 S.Ct. at 2579–80, n. 4, 61 L.Ed.2d at 226, n. 4.

The following facts in this case strongly suggest state action. The district attorney investi-

gator participated with Mountain Bell's Security Manager in an investigation of allegedly harassing telephone calls made by the defendant; the investigator and the security manager conducted a "deterrent interview" with the defendant prior to the installation of the pen register; the investigation by the district attorney and Mountain Bell continued through the period when the pen register, installed at the office of Mountain Bell, was monitoring the telephone numbers dialed from the defendant's telephone; the district attorney sought and received from

*v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949) (as long as federal agent was in some way involved before the object of the search was accomplished, it is immaterial whether he initiated or joined in the search); *Corngold v. United States,* 367 F.2d 1 (9th Cir.1966) (search of airline shipment which was joint operation of federal and airline agents deemed state action). The reason we need not decide the issue in this case is because the prosecution during the proceedings below did not oppose the defendant's suppression motion on the basis of any lack of state action in regard to the installation of the pen register. Rather, the prosecution's basic contention throughout the suppression hearing as well as in the district court appeal was that the defendant, as a telephone subscriber, had no legitimate expectation of privacy in the telephone numbers dialed by her. Indeed, the district court expressly noted the prosecution's concession of state action in its written order affirming the county court's suppression ruling, and the prosecution never raised the issue of state action in its petition for certiorari. Under the circumstances of this case, therefore, the People have clearly abandoned any claim relating to the asserted lack of state action in the installation of the pen register on the defendant's telephone line.[4] *See Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (government loses its right to raise a defendant's lack of standing to challenge a search when it acquiesces in contrary findings or fails to raise the issue in a timely fashion during litigation); *People v. Hearty,* 644 P.2d 302 (Colo.1982) (where district attorney at a suppression hearing initially objected to defendant's standing to contest search of an attorney's

office, but later withdrew any objection on that basis, prosecutorial contention on appeal that defendants lacked standing was deemed waived). We therefore turn to the other issues raised by the People.

### III.

The People's principal argument is that the defendant had no legitimate expectation of privacy in the telephone numbers she dialed on her home telephone and, hence, the warrantless installation of the pen register did not violate the Colorado constitutional prohibition against unlawful searches and seizures. We disagree.

 Article II, Section 7 of the Colorado Constitution provides:

> "The people shall be secure in their persons, papers, houses and effects, from unreasonable searches and seizures; and no warrant to search any place or seize any person or things shall issue without describing the place to be searched, or the person or thing to be seized, as near as may be, nor without probable cause, supported by oath or affirmation reduced to writing."

As in the case of the Fourth Amendment to the United States Constitution, *see Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the purpose of the Colorado constitutional provision is to protect a person's legitimate expectation of privacy from unreasonable governmental intrusions. *E.g., Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980); *People v. Bement,* 193 Colo. 435, 567 P.2d 382 (1977); *People v. Counterman,* 192 Colo. 152, 556 P.2d 481 (1976); *People v. Weisenberger,* 183 Colo. 353, 516 P.2d 1128 (1973). In determining

---

Mountain Bell the pen register record for use in a criminal prosecution of the defendant.

**4.** During legal argument on the motion to suppress, the county court specifically asked the deputy district attorney the following question: "Are you saying, since it [the pen register] was put in place by the telephone company, that we don't have any governmental action here and we shouldn't be arguing the Fourth Amendment, since it doesn't apply to individuals?" To this question the deputy district attorney replied "No, Your Honor," and then proceeded

to state the prosecution's basic position that under *Smith v. Maryland, supra* note 2, the defendant had no constitutionally protected expectation of privacy. At no time during the appeal to the district court was the issue of state action raised by the prosecution. The only argument made by the prosecution in its certiorari petition to this court was that the defendant had no legitimate expectation of privacy in the phone numbers dialed on her telephone.

the legitimacy of the defendant's privacy expectation the appropriate inquiry is whether she expected that the numbers dialed by her on her home telephone would be free from governmental intrusion, and, if she did, whether that expectation is one that society is prepared to recognize as reasonable. *See, e.g., People v. Gomez,* 632 P.2d 586 (Colo.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982); *Charnes v. DiGiacomo, supra; People v. Weisenberger, supra.* In our opinion the defendant's privacy expectation, when measured against this dual standard, qualifies for constitutional protection under Article II, Section 7 of the Colorado Constitution.

## A.

In *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the United States Supreme Court considered "whether the installation and use of a pen register constitutes a 'search' within the meaning of the Fourth Amendment." *Id.* at 736, 99 S.Ct. at 2578, 61 L.Ed.2d at 224. The majority reasoned that "telephone users realize that they must 'convey' phone numbers to the telephone company," *id.* at 742, 99 S.Ct. at 2581, 61 L.Ed.2d at 228, and that any subjective expectation of privacy in telephone numbers dialed is not "one that society is prepared to recognize as 'reasonable.'" *Id.* at 743, 99 S.Ct. at 2582, 61 L.Ed.2d at 229. Since, in the Court's view, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties," no Fourth Amendment violation occurred in the installation

and use of the pen register. *Id.* at 743–44, 99 S.Ct. at 2582, 61 L.Ed.2d at 229.

■ Although Article II, Section 7 of the Colorado Constitution is substantially similar to its federal counterpart, we are not bound by the United States Supreme Court's interpretation of the Fourth Amendment when determining the scope of state constitutional protections. *E.g., Charnes v. DiGiacomo, supra; Denver v. Nielson,* 194 Colo. 407, 572 P.2d 484 (1977); *People v. Hoinville,* 191 Colo. 357, 553 P.2d 777 (1976). *See also* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv.L.Rev. 489 (1977); Note, *The New Federalism: Toward a Principled Interpretation of the State Constitution,* 29 Stan.L.Rev. 297 (1977). In *DiGiacomo,* for example, we rejected the United States Supreme Court's holding in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), that a bank depositor has no reasonable expectation of privacy in checks and deposit slips voluntarily conveyed to the bank and exposed to bank employees in the ordinary course of business. The disclosure to banks of information about the depositor's financial transactions, in our opinion, was a mere by-product of the depositor's major purpose of utilizing the bank as a vehicle for fund transfers and was not a true disclosure to a third person such as would vitiate the depositor's reasonable expectation of privacy in bank records relating to his financial transactions. The depositor's privacy expectation led us to conclude that he had standing "to raise the legitimacy of governmental access to the records in a motion to quash the subpoena for the records." *Supra* 612 P.2d at 1122.[5]

**5.** In *DiGiacomo,* the application for a subpoena *duces tecum* to the bank was made by the Executive Director of the Department of Revenue and was predicated on section 39–21–112(3), C.R.S.1973 (1982 Repl.Vol. 16B), which provides, in pertinent part, as follows:

"If the executive director of the department of revenue is unable to secure from the taxpayer information relating to the correctness of the taxpayer's return or the amount of the income of the taxpayer, the executive director may apply to any judge of the district court of the state of Colorado for the issuance of subpoenas to such other persons

as the executive director believes may have knowledge in the premises, and, upon making a showing satisfactory to the court that the taxpayer cannot be found, or evades service of subpoena, or fails or refuses to produce his records or give testimony, or is unable to furnish such records or testimony, the judge has power, after service of summons upon the persons named in the petition of the executive director, after written notice mailed to the taxpayer to his last known address as set forth in the records of the department of revenue, and after hearing, to cause the issuance of subpoenas under the

We believe the rationale of *DiGiacomo* applies in a comparable manner to the pen register record of telephone calls dialed by the defendant in this case.

## B.

A telephone subscriber such as the defendant has an actual expectation that the dialing of telephone numbers from a home telephone will be free from governmental intrusion. A telephone is a necessary component of modern life. It is a personal and business necessity indispensable to one's ability to effectively communicate in today's complex society. When a telephone call is made, it is as if two people are having a conversation in the privacy of the home or office, locations entitled to protection under Article II, Section 7 of the Colorado Constitution. The concomitant disclosure to the telephone company, for internal business purposes, of the numbers dialed by the telephone subscriber does not alter the caller's expectation of privacy and transpose it into an assumed risk of disclosure to the government. "Privacy is not a discrete commodity, possessed absolutely or not at all. Those who disclose certain facts to a ... phone company for a limited business purpose need not assume that this information will be released to other persons for other purposes." *Smith v. Maryland, supra* 442 U.S. at 749, 99 S.Ct. at 2585, 61 L.Ed.2d at 232 (Marshall, J., dissenting). Besides, it is somewhat idle to speak of assuming risks in a context where, as a practical matter, the telephone subscriber has no realistic alternative. *Id.* at 749–50, 99 S.Ct. at 2585, 61 L.Ed.2d at 232–33 (Marshall, J., dissenting).

We view the disclosure to the telephone company of the number dialed as simply the unavoidable consequence of the subscriber's use of the telephone as a means of communication and the telephone company's method of determining the cost of the service utilized. Indeed, telephone companies have not been insensitive to the confidentiality of this information. *See Reporters Committee For Freedom of the Press v. American Telephone & Telegraph,* 593 F.2d 1030, 1038 (D.C.Cir.1978), *cert. denied,* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979) (noting A.T. & T. policy which prohibits the release of toll billing records in the absence of a valid subpoena, its policy requiring notification to telephone subscribers of the subpoena in civil suits and noncriminal investigations, and also its policy requiring similar notification to subscribers in felony investigations unless the subpoena certifies that such notice could impede the investigation). *See also* Claerhout, *The Pen Register,* 20 Drake L.Rev. 108, 115–16 (1970). A person's privacy expectation should not depend on "risks an individual can be presumed to accept when imparting information to third parties, but on the risks he should be forced to assume in a free and open society." *Smith v. Maryland, supra* 442 U.S. at 750, 99 S.Ct. at 2585, 61 L.Ed.2d at 233 (Marshall, J., dissenting). Any use the telephone company might make of such information for its own internal accounting purposes is far different from governmental evidence gathering. *See* Note, *Pen Registers After Smith v. Maryland,* 15 Harv.C.R.—C.L.L. Rev. 753, 765–66 (1980). We have no doubt, therefore, that the defendant expected that the telephone numbers which she dialed from her telephone would remain free from governmental intrusion.

We are also convinced that the defendant's expectation that the numbers dialed on her telephone would remain free from governmental intrusion is a reasonable one. The mere fact that "our ordinary social intercourse, uncontrolled by government, imposes certain risks upon us hardly means that government is constitutionally unconstrained in adding to those risks." Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 406 (1974). The pen register recorded each telephone number dialed by the defendant as well as the

---

seal of the court to the persons sought to be so summoned requiring any of them to appear before said executive director and give testimony relating to said taxpayer's return

or income. In case any of said persons so served with subpoena fail to respond thereto, the judge may proceed against such persons as in cases of contempt."

date and time of each telephone call. Knowledge of these facts can often yield inferential knowledge of the content of the conversation itself. In addition, a pen register record holds out the prospect of an even greater intrusion in privacy when the record itself is acquired by the government, which has a technological capacity to convert basic data into a virtual mosaic of a person's life.

One's disclosure of certain facts to the telephone company as a necessary concomitant for using an instrument of private communication hardly supports the assumption that the company will voluntarily convey that information to others. Telephone companies are in the business of providing telephone subscribers with the equipment necessary for electronic communication in today's world. The government, in contrast, investigates for the purpose of prosecuting persons for criminal offenses. The expectation that information acquired by the telephone company will not be transferred without legal process, to the government for use against the telephone subscriber appears to us to be an eminently reasonable one.

We agree in this respect with the reasoning of the New Jersey Supreme Court in *State v. Hunt,* 91 N.J. 338, 450 A.2d 952 (1982). There the court held that the New Jersey Constitution granted a telephone subscriber a constitutionally protected privacy interest in the telephone company's home toll billing records for the subscriber's telephone. After noting that the expectation of privacy in toll billing records, which reflect long distance completed calls, is substantially similar to the privacy interest in the pen register, which identifies all local and long distance calls, the court observed:

"It is unrealistic to say that the cloak of privacy has been shed because the telephone company and some of its employees are aware of this information. Telephone calls cannot be made except through the telephone company's property and without payment to it for the service. This disclosure has been necessitated because of the nature of the instrumentality, but more significantly the disclosure has been made for a limited business purpose and not for release to other persons for other reasons. The toll billing record is a part of the privacy package." *Id.* at 347, 450 A.2d at 956.

*See also People v. Blair,* 25 Cal.3d 640, 602 P.2d 738, 159 Cal.Rptr. 818 (1979) ("[a]s in the case of a telephone call from a private residence, a hotel guest may reasonably expect that the calls which he makes from his room are recorded by the hotel for billing purposes only, and that the record of his calls will not be transmitted to others without legal process"); *People v. McKunes,* 51 Cal.App.3d 487, 124 Cal.Rptr. 126 (1975) (legitimate expectation that record of numbers called will be used only for telephone company's internal accounting purposes). Simply stated, merely because the telephone subscriber has surrendered some degree of privacy for a limited purpose to those with whom she is doing business does not render the subscriber "fair game for unrestrained police scrutiny" by virtue of that fact. 1 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 2.7 at 408 (1978). The defendant's expectation of privacy in the numbers dialed on her home telephone is an expectation that we are prepared to recognize as reasonable under Article II, Section 7 of the Colorado Constitution.[6]

6. We acknowledge that some states have held that under their respective state constitutional provisions a telephone subscriber has no legitimate expectation of privacy in the records of the telephone company pertaining to the subscriber's telephone calls. *See, e.g., In re Order for Indiana Bell Telephone to Disclose Records,* 409 N.E.2d 1089 (Ind.1980) (prosecutorial subpoena *duces tecum* to telephone company for long distance telephone records of two of its customers *not violative of state constitutional*

right to freedom of speech and association); *Hastetter v. Behan,* Mont., 639 P.2d 510 (1982) (toll records of telephone customer not protected by state constitutional guarantee of "individual privacy"); *People v. Guerra,* 455 N.Y.S.2d 713, 116 Misc.2d 272 (1982) (warrantless installation by police of pen register on defendant's telephone not violative of state constitutional right "to be secure against unreasonable interception of telephone and telegraph communications"). We find the reasoning of these cases

## C.

The People urge that our holding in *Charnes v. DiGiacomo, supra,* is not applicable here because that case dealt with the content of bank records while pen registers cannot record the content of telephone conversations. As noted above, a record indicating the various numbers, dates and times a telephone subscriber has communicated with another can furnish substantial information about the caller even when the content of those communications is not revealed. That pen registers do not result in actual monitoring of telephone conversations does not render the numbers themselves devoid of a significant privacy interest on the part of the caller. *See District Attorney v. New England Telephone and Telegraph Co.,* 379 Mass. 586, 399 N.E.2d 866 (1980) (where state statute governing the interception of the "contents" of any wire or oral communication defined "contents" to include "any information concerning the identity of the parties to such communication or the existence ... of that communication," the recording of incoming local call numbers by means of a cross frame unit trap falls within the scope of the statute because a telephone number is information "concerning the identity of a party" and "the existence of a communication"). Contrary to the People's argument, any difference between a bank customer's privacy interest in bank records and a telephone subscriber's privacy interest in a record of telephone numbers dialed from a home telephone is too insubstantial to justify a constitutional differentiation in treatment.[7]

## IV.

The People alternatively argue that even if constitutional protection extends to the use of pen registers, a standard short of probable cause should suffice to authorize their installation at the behest of the government. We disagree.

Article II, Section 7 of the Colorado Constitution interposes itself between the people and the government by generally requiring the procurance of a search warrant based on probable cause before the government can intrude into one's legitimate privacy interests. *See, e.g., McCall v. People,* 623 P.2d 397 (Colo.1981); *People v. Lorio,* 190 Colo. 373, 546 P.2d 1254 (1976). While admittedly some forms of governmental intrusion are so narrow in scope and purpose and justified by such substantial law enforcement interests that they may be made on less than probable cause, *see Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *People v. Lewis,* 659 P.2d 676 (Colo. 1983), we are not dealing with such a limited intrusion in this case. Because a telephone subscriber has a legitimate expectation of privacy in the telephone numbers dialed, the installation of a pen register and the acquisition of information about the telephone numbers dialed by the subscriber is nothing less than a full-scale search and

unpersuasive for the very same reason we find unconvincing the United States Supreme Court's holding in *Smith v. Maryland, supra* note 2.

7. Moreover, we cannot blind ourselves to the chilling effect that the unmonitored and warrantless use of pen registers holds out for the associational rights of persons using the telephone as a means of communicating with others. *Colo. Const.* Art. II, Secs. 10 and 24. It has been said that "[o]ne of the simplest contemporary snooping devices is the pen register." A. Miller, *The Assault on Privacy* 43 (1971). Its acquisitive capacity can be magnified by feeding the information into a computer for analysis in order to "reveal patterns of acquaintances and dealings among a substantial group of people" *Id. See also Smith v. Maryland, supra* note 2 (Marshall, J., dissenting) (allowing uncontrolled governmental access to records of telephone numbers dialed would impede associational and journalistic endeavors); *Reporters Committee for Freedom of the Press v. American Telephone and Telegraph,* 593 F.2d 1030 (D.C.Cir.1978), *cert. denied,* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979) (Wright, J., dissenting) (detailing particular political abuses made possible by governmental acquisition of records of telephone numbers dialed); *State v. Hunt,* 91 N.J. 338, 450 A.2d 952 (1982) (Pashman, J., concurring) (governmental access to records of telephone numbers dialed could be used for purpose of political harassment).

seizure in the constitutional sense of those terms. The pen register "looks for" or "searches out" that which is otherwise concealed from governmental viewing. *See* W. LaFave, *supra,* § 2.1 at 222 (1978). Similarly, the creation and subsequent acquisition of the record of the telephone calls made is a "taking" or "seizing" of that information. *Id.*

In the absence of some narrowly defined exception to the warrant requirement, such as exigent circumstances or consent, neither of which is present in this case, a warrantless search is presumed to be invalid. *E.g., People v. Hogan,* 649 P.2d 326 (Colo.1982); *People v. Casias,* 193 Colo. 66, 563 P.2d 926 (1977); *People v. Williams,* 192 Colo. 249, 557 P.2d 399 (1976). Were we to permit an exception to the warrant requirement that would encompass the type of pervasive intrusion that occurred here, we would indeed permit the exception to become the norm, in derogation of the purpose of the warrant requirement itself. In the absence of exigent circumstances or consent, therefore, we decline to permit the governmental installation of a pen register without the procurement of a search warrant supported by probable cause.

## V.

In summary, we hold that Article II, Section 7 of the Colorado Constitution provides a telephone subscriber with a legitimate expectation of privacy in the records of telephone numbers dialed, that such material is protected from unreasonable searches and seizures, that the installation of a pen register to record the numbers dialed constitutes a search, that the acquisition by means of the pen register of the record of the numbers dialed constitutes a seizure, and that in the absence of exigent circumstances or consent law enforcement officers may not procure the installation of a pen register without first obtaining a search warrant supported by probable cause.

The order of the district court is affirmed.

ERICKSON, C.J., and ROVIRA, J., dissent.

ERICKSON, Chief Justice, dissenting:

I respectfully dissent.

In my view, the Colorado Constitution does not require law enforcement officers to obtain a search warrant supported by probable cause prior to the installation of a pen register. Subscribers to telephone services have no legitimate expectation that information relating to telephone numbers dialed on a home telephone will remain private. I would therefore reverse the order of the Boulder District Court.

## I.

We have held that warrantless searches into areas in which an individual has a reasonable expectation of privacy are forbidden absent exigent circumstances. *People v. Edmonds,* 195 Colo. 358, 578 P.2d 655 (1978); *People v. Weisenberger,* 183 Colo. 353, 516 P.2d 1128 (1973). Our expectation of privacy analysis is based on *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1976), and its progeny. The United States Supreme Court has analyzed the principles of *Katz* as requiring a two part inquiry:

"Consistently with *Katz,* this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action. This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' whether, in the words of the *Katz* majority, the individual has shown that 'he seeks to preserve [something] as private.' The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable,"' whether, in the words of the *Katz* majority, the individu-

al's expectation, viewed objectively, is 'justifiable' under the circumstances."

*Smith v. Maryland,* 442 U.S. 735, 740–741, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (citations and footnote omitted). *See also United States v. Knotts,* —— U.S. ——, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983); *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (concurring opinion); *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (plurality opinion). The Supreme Court applied the reasoning of *Katz* to the records obtained through the use of a pen register in *Smith v. Maryland, supra,* finding that a pen register does not constitute a search for purposes of the Fourth Amendment to the United States Constitution.

In *Smith,* the police had asked a telephone company to install a pen register at the company's central offices to record numbers dialed from a certain telephone. The telephone company acceded to the request even though the police had not obtained a warrant or court order. Evidence gathered through use of the pen register enabled the police to obtain a search warrant which led to the arrest and conviction of a person making obscene phone calls.

The United States Supreme Court held that individuals do not have a legitimate expectation of privacy regarding the numbers they dial. According to the Court, telephone users voluntarily transmit the number they dial to the phone company. Subscribers realize that some phone numbers are preserved by the telephone company for long distance billing or for special rates billing. Users are aware that the company can use special equipment to trace fraudulently placed calls, to check for overbilling or defective equipment, and to identify persons making obscene or annoying calls. 442 U.S. at 742, 99 S.Ct. at 2581. The Supreme Court went on to state that:

> "Telephone users, in sum, typically know that they must convey numerical information to the phone company; that the phone company has facilities for recording this information; and that the phone company does in fact record this informa-

tion for a variety of legitimate business purposes. Although subjective expectations cannot be scientifically gauged, it is too much to believe that telephone subscribers, under these circumstances, harbor any general expectation that the numbers they dial will remain secret." *Id.* at 743, 99 S.Ct. at 2581.

The United States Supreme Court also found that even if a subjective expectation of privacy existed, that expectation was not reasonable:

> "[The] petitioner can claim no legitimate expectation of privacy here. When he used his phone, petitioner voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business. In so doing, petitioner assumed the risk that the company would reveal to police the numbers he dialed. The switching equipment that processed those numbers is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber. Petitioner concedes that if he had placed his calls through an operator, he could claim no legitimate expectation of privacy. We are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate.
>
> \* \* \* \* \* \*
>
> "Under petitioner's theory, Fourth Amendment protection would exist, or not, depending on how the telephone company chose to define local-dialing zones, and depending on how it chose to bill its customers for local calls. Calls placed across town, or dialed directly, would be protected; calls placed across the river, or dialed with operator assistance, might not be. We are not inclined to make a crazy quilt of the Fourth Amendment, especially in circumstances where (as here) the pattern of protection would be dictated by billing practices of a private corporation."

442 U.S. at 744–45, 99 S.Ct. at 2582 (citation omitted).

I would agree with the Court in *Smith v. Maryland, supra,* that telephone users do not have a legitimate expectation of privacy in the numbers they dial. While the telephone plays an important role in modern life, that fact does not elevate the service purchased from private telephone companies into a privileged position of privacy. Users willingly and voluntarily convey dialing information to the company in return for connection to the number dialed. The limited capability of a pen register for recording information and the relative innocuousness of a telephone number render the intrusion into privacy interests insubstantial. *Smith v. Maryland,* 442 U.S. at 744, 99 S.Ct. at 2582. *See also People v. DiRaffaele,* 55 N.Y.2d 234, 448 N.Y.S.2d 448, 433 N.E.2d 513 (1982).

The information obtained by a pen register is analogous to the addressing information found on the outside of an envelope or package—the information is related to routing directions and not to the content of the communication. Service people routinely handle mail and packages, limiting legitimate expectations that addresses and postmarks are private. Courts in other jurisdictions have upheld the use of information found on envelopes and packages (the so-called "mail cover"). *See, e.g., United States v. Huie,* 593 F.2d 14 (5th Cir.1979) (relying on *Choate*); *United States v. Choate,* 576 F.2d 165 (9th Cir.1978) (information on envelopes foreseeably available to postal employees). Just as the post office can check the outside of an envelope when it suspects a person of using counterfeit stamps, a phone company can check the numbers dialed by a person suspected of placing harassing or obscene phone calls.

Telephone companies routinely record dialing information as a part of their normal business practices. Toll records of long distance calls are a familiar part of the billing process; most users are aware that such information is gathered by phone companies. *See Hastetter v. Behan,* 639 P.2d 510 (Mont.1982) (billing records not a private matter). Many subscribers can now obtain service where each call is billed separately, whether or not it is long distance or

local. The deregulation of the communications industry may also change billing practices of local phone companies. The many changes in the business practices of public and private entities engaged in the transferral of information undercut claims that a legitimate and reasonable expectation of privacy exists as to the information relinquished when dialing a telephone. It is the content of a conversation which the Constitution protects and not the information necessary to make the telephone connection.

Other types of information transferred by telephone are routinely gathered. A company has a legitimate need to protect its service from being misused. As in any other business, fraud is a constant problem against which a telephone company must protect itself. Use of the pen register to investigate fraud, nuisance, or abuse will occur within the "ordinary course of the company's business" and is a "necessary incident to the rendition of service and protection of company property." J. Carr, *Electronic Surveillance* 84 (1977); *see also Report of the National Commission for the Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance* 118–20 (1976). One court, in upholding the use of evidence obtained by pen register, followed that reasoning, stating that the "dominant purpose behind the [use of the pen register] by the company is the protection of its lines and the rendition of quality service, and the resulting criminal prosecution was merely incident to that company purpose." *District Attorney v. Coffey,* 386 Mass. 218, 434 N.E.2d 1276 (1982). Some courts have held that a telephone company has a duty to investigate subscribers suspected of making harassing calls. *See, e.g., People v. Stewart,* 73 Misc.2d 399, 342 N.Y. S.2d 127 (N.Y.Cr.Ct.1973). A telephone company therefore has a substantial business interest in satisfying its customers who are subject to harassment and in discontinuing the service of those who abuse their telephone privileges. These factors underscore my view that telephone users have no reasonable expectation of privacy in the numbers dialed and that society is not pre-

pared to recognize those expectations as reasonable.

I do not believe that our decision in *Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980), where we held that an individual has a reasonable expectation of privacy in the content of his bank records, dictates a different result. The pen register does not record the content of any conversation; it only records the number dialed. We emphasized in *Charnes* that the substance of the bank records sought was a protected interest, not the fact that there may or may not have been a financial transaction. The intrusion in *Charnes* into the substance of a person's economic life is much greater than the recording of telephone numbers which have been dialed. Moreover, a telephone company has a legitimate business interest in protecting its customers from abuse while a bank would have no similar interest to protect by searching its customers' records.

The expectation of privacy which *Katz* and its progeny have made the polestar in determining whether a search has occurred is an amorphous concept which can be given nearly boundless content. While I sympathize with arguments which insist that all information about an individual's relationships and movements is protected by a privacy interest, I view the expectation of privacy as attaching to the content of a telephone conversation and not to the particular number which has been dialed. *See Hodge v. Mountain States Telephone & Telegraph Co., supra.* Accordingly, I would

conclude that an individual has no reasonable expectation of privacy in the numbers dialed on a telephone.

## II.

The majority reaches the merits of the case after determining that the governmental involvement in the installation of the pen register was so substantial as to rise to the level of state action. The majority notes that the pen register was installed in conjunction with an ongoing joint investigation by the Boulder County district attorney's office and Mountain Bell; that the prosecution disavowed reliance on state action requirements at the suppression hearing; and that Mountain Bell complied with a request by the district attorney's investigator to relinquish the pen register record for the county's criminal prosecution of the defendant. In my view, this case should be remanded for factual findings on the state action issue before the court reaches the merits of the important and unresolved constitutional issues presented on appeal.[1] Furthermore, I believe the majority has improperly upheld the ability of the government to waive state action issues that should not be waivable except in the most clear circumstances.

The state action requirement acknowledges the *sine qua non* of constitutional interpretation. Governmental conduct, to which the limitations of article II, section 7 apply, cannot be restrained by constitutional provisions unless a showing is made that

---

1. The majority is correct in characterizing the record, which is quite ambiguous, as tending to support a finding of state action. The facts, however, do not clearly support a finding of excessive governmental entanglement in Mountain Bell's investigation of Mrs. Sporleder's alleged misuse of her telephone. The majority's finding of a waiver from the prosecution's posture below is unconvincing without further findings of fact. The purported waiver is at best implicit, falling far short of what we should demand for the waiving of an important element of the case. I find the position of the district attorney at the suppression hearing as insufficient to answer the state action issue. In answer to the district court's question of whether "governmental action" was involved in the case, the district attorney said:

"No, Your Honor. *My argument is this was not initiated by a government agency* and, therefore, the Court should consider that, especially in light of the Supreme Court decision that says this doesn't fall into the Fourth Amendment guaranteed by the United States. My basic argument is that it has been decided in *Smith v. Maryland,* and they have determined no expectation of privacy exists.

"The mere fact that the telephone company put the Pen Register on the phone, *and not an agency,* of course, is *not dispositive...."* (Emphasis added). The language quoted above indicates that the district attorney, albeit inartfully, contested the existence of state action. The brief submitted on appeal to this court also contests state actions.

the state has proceeded against an individual. The constitutional prohibitions do not apply to private conduct. *See, e.g., Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (right to sell property pursuant to a warehouseman's lien which was authorized by state law does not constitute state action).

The state action requirement fulfills a role similar to that of subject matter jurisdiction. It has long been recognized that courts cannot adjudicate a dispute unless it has the power to act. *See, e.g., Clinic Masters v. District Court*, 192 Colo. 120, 556 P.2d 473 (1976). Courts receive their power to adjudicate from constitutional and statutory grants. *See Colo. Const.* art. VI, sec. 9. State district courts are courts of "general" jurisdiction, in that they have the power to adjudicate all types of disputes. Courts of "limited" jurisdiction, most notably the federal courts, can only resolve disputes over which they have been affirmatively granted the authority to adjudicate. Thus, a court cannot act unless the subject matter of the dispute is properly heard by that court. Similarly, before a court may resolve a matter against the state, it must be shown that the state has acted in such a way to bring it within constitutional proscriptions. The Colorado Constitution is simply not in issue if the state or its agents have not engaged in prohibited conduct.

Here, I believe that the majority improperly holds that the state action requirement was waived or otherwise lost by the failure of the government to raise it below. Like subject matter jurisdiction, the requirement is a prerequisite to judicial activity and should not be ignored unless the government has clearly lost its right to contest the issue.

I agree with the majority that the record circumstantially supports a finding of state action. *Id.* at 138 n. 3. Without factual findings by the trier of fact, however, I cannot conclude that the state was a party to the installation of the pen register or ordered a private agent to install the register in this case. Accordingly, I would remand the case to the district court for findings of fact on the state action issue.

### III.

Alternatively, assuming that some privacy interest exists in the telephone number one dials, I would adopt a reasonable and articulable suspicion standard as sufficient to authorize the installation of a pen register at governmental request. I believe that the majority's probable cause standard is overly restrictive in view of the interests protected.

The majority asserts that the information conveyed by knowing the numbers dialed on a private telephone is so laden with substantive content that the information cannot be gathered absent probable cause to believe a crime has been or is about to be committed. I believe that the information recorded by a pen register is substantially different in kind and quality from the content of the actual telephone conversation. Most people simply do not have the same expectation of privacy in the number they dial as they do in the content of their conversation.

At the very most then, I would consider the monitoring of the numbers dialed as a relatively insignificant intrusion against which legitimate law enforcement needs should be balanced. Law enforcement officers would be severely crippled in their efforts to prosecute persons who make obscene or harassing phone calls. The very nature of these crimes makes it difficult to obtain more leads than a general pattern of activity. It is questionable whether a pattern of phone calls implicating an individual could meet our standards for probable cause. Consequently, law enforcement efforts would be hampered dramatically for little apparent gain in protected privacy interests. Additionally, less effective enforcement of laws relating to illegal use of the telephone would lead to more individuals suffering from unwanted and frightening calls. The majority takes too lightly the privacy concerns of the recipients of abusive telephone calls. Accordingly, I would, at most, favor the adoption of a

reasonable and articulable suspicion standard in authorizing pen register installation. *Cf. Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (pat down search reasonable if supported by a reasonable and articulable suspicion of criminality); *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971) (investigatory stop permissible in certain situations even though full probable cause missing).

A standard less than probable cause would enable law enforcement officers to install a pen register when their investigation is reasonably focused on a particular individual. Arbitrary and discriminatory practices would be minimized by such a standard while at the same time recognizing legitimate law enforcement needs.

## IV.

The majority's use of the Colorado Constitution to avoid the analysis of *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), raises delicate issues of constitutional interpretation. While I am firmly convinced that ultimately the Colorado Constitution must be interpreted by the Supreme Court of Colorado, I am uneasy with decisions which reach a different result than the United States Supreme Court's interpretation of nearly identical language in the Federal Constitution. The United States Supreme Court may err in its interpretation of the Constitution and should not be followed blindly by courts which disagree with the high Court's analysis. *See, e.g., Jaffree v. Board of School Commissioners of Mobile County,* 554 F.Supp. 1104 (D.Ala.1982) (2426), *rev'd sub nom. Jaffree v. Wallace,* 705 F.2d 1526 (11th Cir.1983) (federal district judge questioning United States Supreme Court's holding in area of school prayer). *See Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (United States Supreme Court reversing the doctrine of separate but equal adopted in *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896)). Lower courts, however, should explain their divergences from the interpretation of higher appellate courts in reaching different conclusions. Courts which fail to explain important divergences from precedent run the risk of being accused of making policy decisions based on subjective result-oriented reasons. *See, e.g., People v. Ramey,* 16 Cal.3d 263, 545 P.2d 1333, 127 Cal. Rptr. 629 (1976) (Clark, J., dissenting) (deference to United States Supreme Court precedent becoming a "shell game"); *People v. Disbrow,* 16 Cal.3d 101, 545 P.2d 272, 127 Cal.Rptr. 360 (1976) (Richardson, J., dissenting) (courts should not diverge from federal precedent interpreting identical language unless conditions peculiar to state mandate a different meaning; otherwise, uncertainty and complexity in rules encouraged).

I would therefore approach the United States Supreme Court's decision in *Smith v. Maryland, supra,* with deference. *Smith* interpreted the Fourth Amendment to the United States Constitution, which reads,

"[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . . but upon probable cause . . . ,"

as not guaranteeing a privacy interest in pen register records. The language of the Colorado Constitution, which the majority reads to guarantee a protected privacy interest, reads substantially the same:

"The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures. . . . "

The language is slightly different and reflects the preferences of the framers of the Colorado Constitution in 1876. While *Smith v. Maryland* should not be dispositive in reading the language of the Colorado Constitution, I am concerned with the majority's failure to demonstrate effectively an intent on the part of Colorado's framers opposite to that of the framers of the Federal Constitution. The test which this court has adopted in past cases and now applies in its privacy analysis is also substantially similar to the federally-derived *Katz* test used by the United States Supreme Court in *Smith v. Maryland.* I would therefore prefer that the majority more solidly ground

its interpretation in the intention of the framers of the Colorado Constitution or expose more fully the faultiness of *Smith's* interpretation of the United States Constitution.

I do not believe the United States Supreme Court is infallible or that state constitutions do not provide needed flexibility in the protection of individual rights. *See* Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv.L.Rev. 489 (1977); Note, *The New Federalism: Towards a Principled Interpretation of the State Constitution,* 29 Stan.L.Rev. 297 (1977). I do believe, however, that courts should be hesitant in interpreting identical language in state constitutions differently in their efforts to reach conclusions which differ from the United States Supreme Court. Principled differences between the state and federal constituions are a necessary and important aspect of our system of federalism. Differences exist and should be applied when appropriate.[2] Here, I see no reason for departing from the rationale of *Smith v. Maryland;* accordingly, I would be less quick than the majority in applying the Colorado Constitution to situations where there is no significant textual difference from its federal counterpart.

## V.

Lastly, I would find inappropriate the district court's application of the exclusionary rule in the context of this case. None of the purposes for which the exclusionary rule was designed—deterrence of police misconduct and protection of the integrity of the judicial process—is advanced by the application of the rule in this case. I would therefore permit the evidence to be used against Mrs. Sporleder at trial as a consequence of a "good faith" exception to the exclusionary rule.

For years courts have been grappling with the proper scope and contours of the exclusionary rule in their efforts to apply the rule rationally to instances of constitutionally impermissible conduct by law enforcement officials. A good faith exception to the exclusionary rule recognizes that the policies supporting the rule are not always furthered by its indiscriminate application. *See Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Williams,* 622 F.2d 830 (5th Cir.1980); *compare* Wilkey, *Enforcing the Fourth Amendment by Alternatives to the Exclusionary rule* (National Legal Center for the Public Interest, July 1982) (arguing in favor of various exceptions to the exclusionary rule) *with* Mertens & Wasserstrom, *The Good Faith Exception to the Exclusionary Rule: Deregulating the Police and Derailing the Law,* 70 Geo.L.J. 365 (1981) (arguing that a good faith exception is unwise); *see also People v. Hogan,* 649 P.2d 326 (Colo. 1982) (Rovira, J., dissenting); *People v. Spies,* 200 Colo. 434, 615 P.2d 710 (Colo. 1980) (Erickson, J., dissenting).

The policy of deterrence [3] is not furthered if the police believe in good faith that their conduct is lawful and reasonable. Good faith police misconduct cannot be deterred by *post hoc* judicial evaluations. The deterrence rationale is especially unconvincing in situations where, as here, the constitutionality of the conduct has never been addressed by a Colorado court. The other rationale for the exclusionary rule—to uphold the integrity of the judicial branch by not allowing illegally obtained evidence to be used at trial [4]—is inapplicable in a borderline case where there are compelling arguments of constitutionality on both sides. The good faith exception permits evidence

2. I believe that our decision in *Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980) (finding a reasonable expectation of privacy in the content of bank records) presents a situation where Colorado's interpretation of the constitutional language is more accurate on both the state and federal levels than the corresponding United States Supreme Court decision in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (finding no reasonable expectation of privacy in the contents of bank records).

3. *See Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

4. *See Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317 (1983).

to be introduced when none of the exclusionary rule policies is furthered.

I would also note that the United States Supreme Court has yet to acknowledge the existence of a good faith exception, although it appears that the Court is close to allowing an exception. The Court declined to address the issue in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), after requesting briefs and oral arguments on the good faith issue. Justice White, however, in a lengthy concurrence sets forth many of the reasons supporting a good faith exception and he apparently reflects the views of a near-majority of the Court.

I would not favor exceptions to the exclusionary rule which would encourage police negligence; a well-crafted exception, however, would not undercut any of the policies supporting the rule. Colorado's General Assembly has recently expressed legislative support of a good faith or "technical violation" exception to the exclusionary rule. In section 16–3–308(2)(b), C.R.S.1973 (1982 Supp.), which was passed in 1981, after the events in this case, the General Assembly opined that evidence seized in good faith reliance on "court precedent which is later overruled" should be admitted at trial. I believe that such an exception to the exclusionary rule should be permitted here. A good faith exception is especially appropriate in cases of first impression where the police have no judicial guidance and no reason to believe that their conduct is constitutionally deficient. *See generally Colorado's Good Faith Exception to the Exclusionary Rule,* 11 Colo.Law. 410 (1982); *Good Faith Exception to the Exclusionary Rule: The Fourth Amendment is Not a Technicality,* 11 Colo.Law. 704 (1982).

The facts of this case support admission of the pen register records at trial. The conduct held unconstitutional by the majority today had been explicitly approved by the United States Supreme Court in *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). The *Smith* case was issued well-before the events of this case, which occurred in 1980, and the police would have acted reasonably in relying on the holding in that case. Nothing in the record indicates that the police acted arbitrarily and maliciously in investigating complaints against Mrs. Sporleder. I would therefore permit the evidence to be admitted at trial.

## VI.

In my view, the majority has incorrectly held that telephone subscribers have a legitimate expectation of privacy in the records of telephone numbers dialed. I, therefore, respectfully dissent.

I am authorized to say that ROVIRA, J., joins me in the dissent.

ROVIRA, Justice, dissenting:

Although I join the Chief Justice's dissenting opinion, I write separately to emphasize my disagreement with the court's unquestioning acceptance that suppression of the pen register tape is necessary to effectuate the purpose of art. II, sec. 7, of the Colorado Constitution.

*Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), was decided in June 1979, approximately one year before the pen register was installed on the defendant's home telephone. At that time, prosecutors and police officers were on notice that the nation's highest court had determined that the installation and use of a pen register was not a search within the meaning of the fourth amendment, and therefore no warrant was required.

On May 20, 1980, the date the pen register was installed, neither we nor the Colorado Court of Appeals had expressed any views concerning the constitutionality of installing a pen register without first obtaining a warrant. Also on that date, we had not decided *Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980), a case upon which respondent and the majority rely to support their claim of "legitimate expectation of privacy."

The exclusionary rule is not a personal constitutional right, but a remedy adopted by the United States Supreme Court to

**152**

protect the fourth amendment right of citizens. By denying admission of evidence obtained through unlawful police activity, it was believed law enforcement officers would be deterred from future violations of the fourth amendment.

However, the exclusionary rule has not been interpreted by the United States Supreme Court as requiring exclusion of all illegally seized evidence. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). For example, the rule has not been applied when police act in good-faith reliance upon a statute or ordinance that is subsequently held to be unconstitutional. *United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *Michigan v. DeFillippo,* 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Application of the exclusionary rule has been restricted to those areas where its remedial objectives are thought most efficaciously served. *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

Here, application of the rule has no support in the prior decisions of this court or in logic, because the challenged act of the law enforcement official took place at a time when the United States Supreme Court had addressed the issue of pen registers, and the evidence was obtained by the district attorney acting in the reasonable belief that his conduct did not violate the constitutional rights of the defendant.

The deterrent purpose of the exclusionary rule "assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right." *United States v. Peltier,* 422 U.S. 531, 539, 95 S.Ct. 2313, 2318, 45 L.Ed.2d 374. If deterrence of unlawful police conduct is the bedrock on which the exclusionary rule rests, and I believe it is, then evidence should be suppressed only where a law enforcement officer had knowledge, or may properly be charged with knowledge, that it was obtained in an unconstitutional manner. It is clear to me that where law enforcement officers act in conformity with, and in reliance upon, a decision of the United States Supreme

Court, application of the exclusionary rule is not called for. The majority opinion ignores the reason for the rule and applies it in a mechanistic and inappropriate fashion.

Indeed, the use of the exclusionary rule in this case demonstrates why a good-faith exception to the rule should be applied. I cannot think of a sounder basis for law enforcement officers to act upon than a decision of the United States Supreme Court. To exclude evidence based upon such reliance because we later conclude that there is a violation of the Colorado Constitution is to punish law enforcement officers for a lack of prescience that warrants neither criticism nor censure. In effect, the court penalizes society by interfering in the truth-seeking function of a criminal trial by barring relevant and trustworthy evidence. In no way does application of the exclusionary rule in this case serve the deterrent function that is the foundation upon which the rule rests. I respectfully dissent.

I am authorized to say that CHIEF JUSTICE ERICKSON joins in this dissent.