The PEOPLE of the State of Colorado,
Plaintiff-Appellant,

v.

Casey CORR, Defendant-Appellee.

No. 83SA415.

Supreme Court of Colorado,
En Banc.

April 30, 1984.

Robert L. Russel, Dist. Atty., Kenneth H. Jaynes, Deputy Dist. Atty., Colorado Springs, for plaintiff-appellant.

Robert S. Berger, P.C., Robert S. Berger, Denver, for defendant-appellee.

LOHR, Justice.

In an indictment returned by a statewide grand jury on February 19, 1982, Casey Corr was charged with possession of more than one ounce of marijuana,[1] and conspiracy to possess more than one ounce of marijuana.[2] Her husband, Michael Aukes, was charged with possession of cocaine;[3] possession of more than one ounce of marijuana; three counts of conspiracy to possess more than one ounce of marijuana; and sale, dispensing, distribution, possession or importing of more than one hundred pounds of marijuana.[4] Three others were also charged with possession and conspiracy. Corr moved to suppress evidence obtained from telephone toll call records and a wiretap. Her motion was granted on August 26, 1983.[5] The district attorney then filed an interlocutory appeal challenging the suppression order.[6] We affirm the suppression of the toll records, reverse the suppression of the wiretap evidence, and remand the case to the district court for further proceedings.

I.

Corr questions whether Organized Crime Strike Force (Strike Force) investigators, who obtained the toll records through the use of grand jury subpoenas, had the authority to do so. It is necessary to detail the Strike Force's structure and sources of authority in order to evaluate this claim.

The grand jury indictments in this case resulted from an investigation conducted by the Strike Force beginning in 1980. The original leads grew out of a wiretap in the Denver Comets volleyball team drug investigation. *See People v. Gable,* 647 P.2d 246 (Colo.App.1982).

At the time of the investigation of the defendants' activities, the Strike Force comprised a group of police officers and attorneys headed by an assistant attorney general, who reported to former Attorney General J.D. MacFarlane. The officers were assigned to the Strike Force by local law enforcement authorities throughout the state. They carried badges and cards issued by the Attorney General identifying them as Strike Force investigators. Their salaries were paid by the local authorities, but the Attorney General's office provided for their overtime pay, expenses and insurance coverage. In contrast to the investigators, the Strike Force attorneys were all members of the Attorney General's staff. The investigators generally initiated and carried out investigations, while the attorneys advised them on legal matters and presented evidence resulting from their investigations to state grand juries.

Also at this time, the Attorney General annually petitioned the chief judge of a district court to empanel a statewide grand jury pursuant to section 13–73–101, C.R.S. 1973, to deal with Strike Force-related investigations. Drug cases constituted the largest share of such investigations. It was such a statewide grand jury that handed down the indictments in this case, after hearing the testimony of Strike Force in-

1. Section 18–18–106(4), C.R.S.1973 (1983 Supp.).

2. Section 18–2–201, C.R.S.1973 (1978 Repl.Vol. 8).

3. Section 18–18–105(1)(a), C.R.S.1973 (1983 Supp.).

4. Section 18–18–107(1)(e), C.R.S.1973 (1983 Supp.).

5. The incomplete record supplied on appeal does not disclose who moved to suppress the toll record and wiretap evidence. We have been informed through telephone inquiry to Teller County District Court that Corr, Aukes and defendant Abbott filed separate motions to suppress, followed by an amended motion to suppress submitted by Corr on behalf of herself, Aukes, Abbott and defendant Black. These motions were denied. Corr alone then filed a motion to reconsider, which was granted by the district court. Because only Corr has made an appearance before this court, she has been treated as the sole appellee.

6. This interlocutory appeal was brought pursuant to section 16–15–102(11), C.R.S.1973 (1978 Repl.Vol. 8), section 16–12–102, C.R.S.1973 (1978 Repl.Vol. 8), and C.A.R. 4.1.

vestigators and others, presented to it by Strike Force attorneys.[7]

At the time of the investigations leading up to the indictment of the defendants in the present case, the Strike Force had no specific statutory basis, although the legislature had appropriated funds for it at least since 1977 or 1978.[8] The grand jury functions of the Strike Force staff attorneys derive authority from section 13–73–106, C.R.S.1973, which states that the presentation of evidence to a state grand jury shall be made by the attorney general or his designee. The authority for the investigative functions of the Strike Force police officers at that time is more difficult to ascertain. The Attorney General asserted at the suppression hearing in this case that such investigations were legitimated by the Attorney General's "inherent authority." Yet this court has stated that the Attorney General has no powers beyond those granted by the general assembly. *People ex rel. Tooley v. District Court*, 190 Colo. 486, 489, 549 P.2d 774, 777 (1976); *see* section 24–31–101, C.R.S.1973 (1982 Repl.Vol. 10).

There are several possible statutory sources of investigative authority. By statute, the Attorney General may appoint such deputies and assistants as are necessary for the efficient operation of his office, within appropriation limits. Section 24–31–101(3), C.R.S.1973; *see also* section 24–31–104, C.R.S.1973. The Colorado Criminal Code defines peace officers as including authorized investigators of the At-

torney General; hence the appointment by the Attorney General of investigators in appropriate instances was contemplated by the legislature. *See* section 18–1–901(3)(*l*), C.R.S.1973 (1978 Repl.Vol. 8). The Attorney General claims that investigation is ancillary to his duty to present evidence to the state grand jury. Furthermore, under the Colorado Organized Crime Control Act[9] (which went into effect on July 1, 1981, while the investigation in the case at hand was underway), when the Attorney General "has reason to believe" that any person or enterprise may be in possession of documents relevant to a racketeering investigation he may issue a "civil investigative demand" requiring production of the material for examination. Ch. 229, sec. 1, § 18–17–107, 1981 Colo.Sess.Laws 1015, 1022–25. ("Racketeering" includes the drug charges alleged in this case. Ch. 514, sec. 48, § 18–17–103(5)(b)(XIV), 1981 Colo. Sess.Laws 2022, 2032; ch. 229, sec. 1, § 18–17–103(5)(b)(XIV), 1981 Colo.Sess. Laws·1015, 1018.) Presumably, the Attorney General could develop such "reason to believe" through staff investigations like those of the Strike Force. The Attorney General claims that his appointment power, the definition of peace officers, his duties under the statewide grand jury statute and the Colorado Organized Crime Control Act, and continuing appropriations for the Strike Force add up to legislative sanction of the investigative activities of the Strike Force.[10]

7. The organization of the Strike Force has changed substantially since the investigation in this case was undertaken. In 1983, the legislature incorporated the Strike Force into the Colorado Bureau of Investigation. Ch. 267, sec. 1, §§ 24–32–416 to –423, 1983 Colo.Sess.Laws 901. This removed the Strike Force from the Attorney General's jurisdiction. At the same time, the legislature established a special prosecution unit under the control of the Attorney General to render legal advice to the Strike Force. Ch. 267, sec. 2, § 24–31–105, 1983 Colo.Sess.Laws 901, 903.

8. The Strike Force was originally funded by the Law Enforcement Assistance Administration (LEAA), a federal agency. The LEAA required the creation of an "Organized Crime Advisory Council" to set policy for the Strike Force. The Advisory Council was made up of persons ap-

pointed periodically by the governor and consisted of the Attorney General, various district attorneys and police chiefs, and others. After LEAA funds ran out in 1977 or 1978, the Advisory Council continued to meet without any statutory authority two to four times a year, at least until November 1982. In 1983 the legislature created an "advisory commission" to set investigative guidelines for the Strike Force. *See* ch. 267, sec. 1, § 24–32–419, 1983 Colo.Sess.Laws 901, 902.

9. Ch. 229, sec. 1, §§ 18–17–101 to –109, 1981 Colo.Sess.Laws 1015.

10. In addition to elaboration of the grand jury and investigative powers of the Strike Force, there was prolonged testimony and discussion at the suppression hearing concerning the pros-

Corr's central contention is not that the police officers on the Strike Force had no authority derived from the Attorney General to investigate drug rings, but that whatever authority they had was insufficient to validate the investigative techniques employed in this case. This assertion requires a detailed discussion of the facts of the case.

After formal investigation of the defendants began in 1980, members of the Strike Force and cooperating police officers in Teller County, Colorado, tried to learn about the alleged drug distribution network through a variety of means. The legitimacy of most of these methods, including surveillance, license plate checks, criminal record checks and the cultivation of informants, is not challenged by Corr. However, on several occasions the Strike Force sought and obtained telephone toll call records for a telephone registered in the name of Casey Corr, at a home in Florissant, Colorado, where she and her husband, Michael Aukes, lived. Corr claims that these were illegal searches.

On February 17, 1981, the Attorney General petitioned the chief judge of the Denver District Court to empanel a statewide grand jury pursuant to section 13–73–101, C.R.S.1973, to investigate gambling, theft, conspiracy and drug charges. One of the stated bases for seeking creation of a statewide grand jury was the assertion that the Strike Force, responsible for the investigation of multi-county criminal acts, would "require" statewide grand jury investigations. The court issued an order on February 18th empaneling a statewide grand jury.

On February 19th, in mid-March, and on May 15th and August 12th, Strike Force attorneys moved for the issuance of a subpoena duces tecum in connection with the grand jury proceedings to obtain Casey Corr's toll records.[11] On each occasion, the court ordered that the subpoena be issued, and the clerk of the court issued a subpoena to Mountain States Telephone and Telegraph Company (Mountain Bell) commanding the delivery of the toll records "to this Court or to an authorized representative of the State Grand Jury."[12] Mountain

---

ecutorial powers of Strike Force attorneys and other members of the Attorney General's staff. By law, the Attorney General "shall appear for the state and prosecute and defend all actions and proceedings, civil and criminal, in which the state is a party or is interested when required to do so by the governor ...." Section 24–31–101(1)(a), C.R.S.1973 (1982 Repl.Vol. 10); *see also People ex rel. Tooley v. District Court,* 190 Colo. 486, 549 P.2d 774 (1976); *People ex rel. Witcher v. District Court,* 190 Colo. 483, 549 P.2d 778 (1976). District attorneys may also appoint members of the Attorney General's staff as special deputy district attorneys to prosecute cases. Ch. 184, sec. 1, § 20–1–201(1)(c), 1979 Colo.Sess.Laws 769; *cf. People ex rel. Brown v. District Court,* 196 Colo. 359, 585 P.2d 593 (1978) (no such appointment allowed under previous law). Corr asserts that when neither the governor nor a district attorney has requested action by the Attorney General's office under these provisions, the Attorney General lacks not only prosecutorial authority but investigative authority as well. She cites Standards for Criminal Justice § 3–3.1 (2d ed. 1982) for this proposition. This standard describes how a prosecutor should carry out his investigative function; it does not purport to restrict a prosecutor's investigative authority, from whatever source derived. We agree with the Attorney General that statutory investigative powers can exist independent of prosecutorial powers.

11. The following averments were made in support of the motions:

 1. A State Grand Jury is presently impaneled pursuant to the provisions of Title 13, Article 73, C.R.S.1973.

 2. The Attorney General or his designee is authorized to present evidence to the State Grand Jury.

 3. Certain information and allegations concerning violations of penal statutes have come to the attention of the Attorney General which may require investigation by the State Grand Jury.

 4. In order to determine whether a sufficient basis exists for a State Grand Jury investigation of said allegations or whatever other action may be deemed appropriate by the Attorney General, a review of the items sought to be produced is necessary.

 5. The disclosure of the existence of this request could impede the investigation being conducted and thereby interfere with the enforcement of the law.

12. The motion and order for the subpoena issued on March 24th are not in the record, but the record is consistent with the inference that the procedure followed for that subpoena was the same, and the parties have not suggested otherwise.

Bell was instructed in each subpoena not to disclose the existence of the request until further order, and to direct any questions to Karen Dunafon, a Strike Force investigator. According to testimony at the suppression hearing, the subpoenas were served on Mountain Bell by David Kinard, another Strike Force investigator, and the toll records were brought back by him to Strike Force offices. The records, which were in the form of telephone bills for individually billed calls, were then analyzed by Dunafon and others trying to establish the dimensions of the alleged drug network. They telephoned or wrote to Mountain Bell to obtain subscriber information for the numbers called, and then tried to determine whether those called were involved in the criminal endeavor.

On September 14, 1981, Robert L. Simmons, another Strike Force investigator, filed a 164-page affidavit in the District Court for Teller County in support of an application to intercept wire communications (a wiretap) on Casey Corr's telephone line in connection with the continuing drug trafficking investigation, pursuant to section 16–15–102, C.R.S.1973 (1978 Repl.Vol. 8). The affidavit set forth information obtained during the investigation from informants, other police officers, surveillance and the toll records to establish the requirements for wiretapping under subsections 16–15–102(2) and (4). The district court authorized the wiretapping. It began on September 15th, the court extended the duration of the wiretap authorization on October 13th, and wiretapping was discontinued on November 15th. Corr claims that the wiretap evidence is derived from the toll records, which were obtained through an assertedly illegal search, and

therefore must be suppressed as fruits of that search under the rule of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

On November 17, 1981, Strike Force Investigator Simmons obtained a search warrant for the residence of Corr and Aukes. Aukes, Corr and two others were then arrested.[13]

On December 2nd, approximately two weeks after the arrests, a Strike Force attorney filed a "motion for authorization for state grand jury to investigate matter," requesting authorization of a grand jury investigation of the marijuana and cocaine trafficking activities of Aukes, Corr and others. The supporting affidavit by Investigator Simmons averred that "it is essential to seek the statewide investigative powers of the State Grand Jury, in order to conduct and complete the investigation. Books, records, tolls and the production of testimony are essential to the successful prosecution of the conspirators in this trafficking system." The affidavit neglected to mention that Aukes, Corr and the others had already been arrested. Also on December 2nd the court issued an order authorizing the requested grand jury investigation.[14] Two Strike Force investigators then were sworn in as grand jury investigators. They testified before the statewide grand jury, and the grand jury returned the indictments in this case on February 19, 1982.

The Strike Force investigators were appointed as grand jury investigators under Crim.P. 6.5, which allows the appointment of investigators "to assist the grand jury in its investigative functions." Such investigators may be officers presently investigat-

---

**13.** The arrests and the search were performed by Strike Force investigators together with Teller County police officers. The investigators, as peace officers, had authority to arrest and search. *See* sections 16–3–102, 16–3–305, C.R.S. 1973 (1978 Repl.Vol. 8). There is some discussion in the record concerning whether or not the authority of the investigators as peace officers was statewide [*see People v. Wolf,* 635 P.2d 213 (Colo.1981) ] and no arrest warrant appears in the record, but we do not address these issues because they are not related to the trial court's

suppression order, and not presented for review.

**14.** At the suppression hearing, a Strike Force attorney stated that such an order was neither required nor authorized by any legal authority, but it was customary for the Attorney General to obtain one. Corr offers it as evidence of irregularity, without claiming that the procedure contravened law.

ing grand jury subjects. *Id.* The suppression hearing record is ambiguous concerning what kinds of investigation, if any, the newly-appointed grand jury investigators performed. Strike Force Investigator Simmons testified that there was no further field investigation of the four defendants arrested on November 17th. However, he characterized his testimony to the grand jury regarding these four after he was appointed a grand jury investigator as investigative. A Strike Force attorney also characterized the grand jury proceedings following the arrest of the four as investigative, because the seeking of witnesses, compelling of sworn testimony and offers of immunity aided in ascertaining the scope of the alleged drug trafficking conspiracy. Simmons noted that the grand jury also indicted a fifth person who had not been arrested on November 17th. The record does not disclose the disposition of charges against this defendant, who apparently did not join in the motions to suppress.

It is unclear whether the toll records subpoenaed in the name of the grand jury ever reached the grand jury. Simmons remembered telling the grand jury that he had subpoenaed toll records, but he could not recall whether the toll records themselves were presented to the grand jury.

The positions of the parties may be framed as follows. Corr claims that the use of grand jury subpoenas by the Strike Force to obtain toll records circumvented the warrant and probable cause requirements recognized in *People v. Sporleder*, 666 P.2d 135 (Colo.1983), and constituted grand jury abuse, and that therefore the toll records and derivative evidence must be suppressed. The prosecution asserts that the use of grand jury subpoenas by the Strike Force was legitimate, and that in any event the ruling in *Sporleder* does not apply to toll records. After discussing the impact of *Sporleder* on this case, we will return to the grand jury subpoena issue.

## II.

In *People v. Sporleder*, 666 P.2d 135 (Colo.1983), this court held that the use of a pen register to record the numbers dialed on a telephone constituted a search within the meaning of Article II, section 7 of the Colorado Constitution, and therefore that law enforcement officers generally must obtain a search warrant supported by probable cause before installation. The prosecution would distinguish between pen registers, which record all telephone numbers dialed from a specific telephone, and toll records, which record only those calls individually billed, because of an asserted lesser expectation of privacy in the latter. We reject this distinction. It is clear from the rationale of *Sporleder* that individually billed calls enjoy the same expectation of privacy as other calls do. We said in *Sporleder*:

A telephone subscriber such as the defendant has an actual expectation that the dialing of telephone numbers from a home telephone will be free from governmental intrusion. A telephone is a necessary component of modern life. It is a personal and business necessity indispensable to one's ability to effectively communicate in today's complex society. When a telephone call is made, it is as if two people are having a conversation in the privacy of the home or office, locations entitled to protection under Article II, Section 7 of the Colorado Constitution. The concomitant disclosure to the telephone company, for internal business purposes, of the numbers dialed by the telephone subscriber does not alter the caller's expectation of privacy and transpose it into an assumed risk of disclosure to the government....

We view the disclosure to the telephone company of the number dialed as simply the unavoidable consequence of the subscriber's use of the telephone as a means of communication and the telephone company's method of determining the cost of the service utilized....

The pen register recorded each telephone number dialed by the defendant as well as the date and time of each telephone call. Knowledge of these facts can often yield inferential knowledge of

the content of the conversation itself. In addition, a pen register record holds out the prospect of an even greater intrusion in privacy when the record itself is acquired by the government, which has a technological capacity to convert basic data into a virtual mosaic of a person's life.

One's disclosure of certain facts to the telephone company as a necessary concomitant for using an instrument of private communication hardly supports the assumption that the company will voluntarily convey that information to others.... The expectation that information acquired by the telephone company will not be transferred[,] without legal process, to the government for use against the telephone subscriber appears to us to be an eminently reasonable one.

666 P.2d at 141–42. Here, as in *Sporleder,* disclosure of the number dialed was an unavoidable consequence of the telephone company's method of determining the cost of the service utilized. The toll records reflected the number dialed as well as the date and time of each call. It is clear that the reasonable expectation of privacy found in *Sporleder* is not based on the fact that some calls are individually billed to the subscriber, as the prosecution would have it, but rather on the expectation that the telephone company will not voluntarily disclose dialed numbers to the government. We conclude that the constitutional protections applied to pen register information in *Sporleder* also apply to toll records.[15]

 The prosecution urges that the toll records should not be suppressed under the *Sporleder* ruling because the action of the Strike Force investigators constituted a "technical violation" under ch. 188, sec. 1, § 16–3–308, 1981 Colo.Sess.Laws 922. Under § 16–3–308(2)(b), a technical violation includes reasonable good faith reliance upon a court precedent which is later overruled. Under § 16–3–308(1), evidence seized by a peace officer as a result of a technical violation shall not be suppressed. *See People v. Mitchell,* 678 P.2d 990 (Colo. 1984). The prosecution suggests that the toll records should not be suppressed because the Strike Force investigators were acting in good faith reliance upon *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), which held that the release of information from pen registers, and by implication toll records, did not contravene any reasonable expectation of privacy under the Fourth Amendment to the United States Constitution. Of course, *Sporleder* did not "overrule" *Smith; Sporleder* construed Article II, Section 7 of the Colorado Constitution. It was explicitly based on, and foreshadowed by, *Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980). In *Charnes* this court held that a bank customer has a reasonable expectation of privacy under Article II, Section 7 of the Colorado Constitution in the bank records of his financial transactions.[16] *But cf. United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (no such expectation of privacy under the Fourth Amendment). When the courts apply settled precedent to different factual situations, no real question of retroactivity arises. *United States v. Johnson,* 457 U.S. 537, 549, 102 S.Ct. 2579, 2587, 73 L.Ed.2d 202 (1982). In light of our decision in *Charnes, Smith v. Maryland* supplied no basis for good faith reliance that a tele-

---

**15.** Although the United States Supreme Court held in *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), that there was no legitimate expectation of privacy under the Fourth Amendment in numbers dialed, it too rejected a distinction between individually billed calls and other calls.

The fortuity of whether or not the phone company in fact elects to make a quasi-permanent record of a particular number dialed does not, in our view, make any constitutional difference.... Fourth Amendment protec-

tion [cannot exist] depending on how the telephone company chose to define local-dialing zones, and depending on how it chose to bill its customers for local calls.... We are not inclined to make a crazy quilt of the Fourth Amendment ....

442 U.S. at 745, 99 S.Ct. at 2582.

**16.** Without discussion, the standards enunciated in *Charnes* were given retroactive application in *Pignatiello v. District Court,* 659 P.2d 683 (Colo. 1983).

phone customer enjoyed no reasonable expectation of privacy in telephone toll records under Article II, Section 7 of the Colorado Constitution. Therefore, we hold that the warrant and probable cause requirements recognized in *Sporleder* as generally applicable to telephone records apply to the searches here that took place in 1981, unless the fact that they were done in the name of the statewide grand jury dictates otherwise. We now turn to that question.

### III.

On each of the four occasions when Strike Force investigators obtained Casey Corr's toll records, they did so under the authority of what was purported to be a grand jury subpoena specifically authorized by the chief judge of the Denver District Court. Under Crim.P. 6.1, grand jury subpoenas "shall be issued in accordance with the rules of criminal procedure and [the grand jury] rules"; under Crim.P. 17(a) a subpoena is issued by the court clerk under seal of the court.[17] The requirement that the grand jury must rely upon the courts to compel the production of documents is a significant limitation upon the grand jury. *Losavio v. Robb*, 195 Colo. 533, 579 P.2d 1152 (1978); *see also A v. District Court,*

191 Colo. 10, 550 P.2d 315 (1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977). Crim.P. 17(c) states that the court "on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive." This rule embodies the restriction of section 16–5–204(4)(i)(II), C.R.S.1973 (1978 Repl.Vol. 8), which states that production of documents subpoenaed by a grand jury shall not be required if upon motion and hearing the court finds, among other things, that compliance would be unreasonable or oppressive.[18]

The prosecutor cites *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946), and its Colorado progeny[19] for the proposition that if a grand jury subpoena is for a lawfully authorized purpose, is relevant to the grand jury inquiry, and is reasonably particular, this is equivalent under the Fourth Amendment to the establishment of probable cause for a search warrant. *Id.* at 208–09, 66 S.Ct. at 505–06. However, a grand jury subpoena without probable cause not only must pass constitutional muster, but also must comport with the "not unreasonable or oppressive" standard under Crim.P. 17(c) and section 16–5–204(4)(i)(II). *Losavio v. Robb*, 195 Colo.

**17.** For the purposes of the introductory portion of Crim.P. 17, the grand jury stands in the place of the prosecutor or defendant, and grand jury proceedings fall within the scope of the phrase "trial or other hearing."

**18.** Under section 16–5–204(4)(i), C.R.S.1973 (1978 Repl.Vol. 8),

No person subpoenaed to testify or to produce books, papers, documents, or other objects in any proceeding before any grand jury shall be required to testify or to produce such objects, or be confined as provided in this section, for his failure to so testify or produce such objects if, upon filing a motion and upon an evidentiary hearing before the court which issued such subpoena or a court having jurisdiction under this section, the court finds that:

(I) A primary purpose or effect of requiring such person to so testify or to produce such objects before the grand jury is or will be to secure testimony for trial for which the defendant has already been charged by information, indictment, or criminal complaint;

(II) Compliance with a subpoena would be unreasonable or oppressive;

(III) A primary purpose of the issuance of the subpoena is to harass the witness;

(IV) The witness has already been confined, imprisoned, or fined under this section for his refusal to testify before any grand jury investigating the same transaction, set of transactions, event, or events; or

(V) The witness has not been advised of his rights as specified in paragraph (a) of this subsection (4).

**19.** *Pignatiello v. District Court,* 659 P.2d 683 (Colo.1983); *Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980); *Losavio v. Robb,* 195 Colo. 533, 579 P.2d 1152 (1978); *People ex rel. MacFarlane v. American Banco Corp.,* 194 Colo. 32, 570 P.2d 825 (1977) (Attorney General's consumer protection subpoenas); *A v. District Court,* 191 Colo. 10, 550 P.2d 315 (1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 737, 50 L.Ed.2d 751 (1977); *see Gher v. District Court,* 183 Colo. 316, 516 P.2d 643 (1973).

533, 537–38, 579 P.2d 1152, 1155–56 (1978). Where, as here, disclosure of seizure is withheld indefinitely from a party having an expectation of privacy in the subpoenaed materials (i.e., the telephone subscriber) so that that party is denied the predisclosure hearing to which he is entitled under section 16–5–204(4)(i), it is left to the court in subsequent proceedings to evaluate whether the subpoena could have been quashed if tested under the standards of that statute and, if so, to fashion an appropriate remedy.[20]

It is unnecessary to determine whether the subpoenas for toll records here were unreasonable or oppressive, because we are satisfied that under the facts of this case the subpoenas were not bona fide grand jury subpoenas. Here, as in *Gher v. District Court*, 183 Colo. 316, 516 P.2d 643 (1973), grand jury subpoenas were used for an improper purpose. *See also People v. Vesely*, 41 Colo.App. 325, 587 P.2d 802 (1978).

■ It is apparent that what the Denver District Court labelled grand jury subpoenas were in fact obtained on the initiative of Strike Force investigators. They framed the requests to the court, served the subpoenas on Mountain Bell, took the toll records to their offices, analyzed them, and incorporated them into the wiretap af-fidavit. The mere fact that the toll records later were referred to in grand jury testimony, although apparently never presented to the grand jury, is insufficient to establish through usage by the grand jury that the toll records were the product of a grand jury subpoena.[21] The only other reason why these subpoenas might be deemed grand jury subpoenas is that the toll records were turned over to investigators who were, in some sense, affiliated with the grand jury. The toll records were turned over to the Strike Force investigators, although the subpoenas instructed that they be delivered "to [the Denver District] Court or to an authorized representative of the State Grand Jury," because Mountain Bell believed that Strike Force investigators were authorized representatives of the statewide grand jury.[22]

■ In reviewing the purported sources of investigative authority for the Strike Force discussed above, it is clear that neither their status as peace officers nor legislative support for the Strike Force through continuing appropriations could render Strike Force investigators grand jury investigators. The prosecution has not alleged that these subpoenas were, in effect, civil investigative demands under the Colorado Organized Crime Control Act.[23] No members of the Strike Force were appointed as

---

**20.** It is unclear whether indefinite nondisclosure is fully consistent with the provisions of section 16–5–204(4) and Crim.P. 6.9 protective of grand jury witnesses. It is also unclear whether *Oklahoma Press*, which was premised on the assumption that when documents are subpoenaed, "[n]o officer or other person [seeks] ... to seize or examine [the subpoenaed] books, records or papers without ... assent, otherwise than pursuant to orders of court authorized by law and made after adequate opportunity to present objections," 327 U.S. at 195, 66 S.Ct. at 498, applies to a case where records are obtained from a telephone company without the subscriber's assent or his opportunity to present objections. Although the situation was analogous, these issues apparently were not raised in *Charnes v. DiGiacomo*, 200 Colo. 94, 612 P.2d 1117 (1980). In light of our holding, they need not be resolved here.

**21.** To hold otherwise would imply that any evidence of which the grand jury was merely later informed could be subpoenaed, without a warrant based on probable cause.

**22.** If the Strike Force investigators were authorized representatives of the statewide grand jury, then, contrary to Corr's allegations, the grand jury secrecy provisions of Crim.P. 6.2 and 6.9(c) were not contravened.

**23.** It was held in *People v. Vesely*, 41 Colo.App. 325, 587 P.2d 802 (1978), that misuse of grand jury subpoenas by a prosecutor was harmless error if the prosecutor could have obtained the same evidence by another avenue. We note that there are substantial procedural requirements for civil investigative demands under ch. 229, sec. 1, § 18–17–107, 1981 Colo.Sess.Laws 1015, 1022–25 that may or may not have been satisfied by the procedure followed here, and that the Colorado Organized Crime Control Act took effect on July 1, 1981, which was after three of the four subpoenas under consideration here were issued.

grand jury investigators under Crim.P. 6.5 for this investigation until several months after the subpoenas were issued. Therefore, the only basis by which the Strike Force investigators could claim to be authorized representatives of the statewide grand jury arises from the Attorney General's duties under the statewide grand jury statute in conjunction with his appointment power.

 We hold that the responsibility of the Attorney General or his designee to present evidence to the statewide grand jury (section 13–73–106) together with his power to appoint deputies and assistants necessary for the efficient operation of his office (section 24–31–101(3)) do not give him the authority to confer full grand jury subpoena power upon police officers by naming them Strike Force investigators. The contrary result would, in effect, create a special police force not bound by the requirement that searches generally be conducted by warrant supported by probable cause. This is abhorrent to the constitutional guarantee of security against unreasonable searches and seizures. We recognize that it may sometimes be difficult to discern when an investigator is acting as a peace officer subject to full constitutional restraints, and when he shares in the greater authority of the grand jury as its authorized representative. *See People v. Coto*, 199 Colo. 508, 611 P.2d 969 (1980) (Strike Force investigators as peace officers performed illegal search). We cannot resolve this ambiguity here; we hold only that under the facts of this case Strike Force investigators exceeded their authority in using grand jury subpoenas to obtain the toll records.[24] Therefore, the trial court properly suppressed the toll records.

### IV.

The order suppressing the wiretap evidence was appealed to this court under section 16–15–102(11), C.R.S.1973 (1978 Repl.Vol. 8), which allows the prosecution to appeal an order to suppress intercepted wire communications. The wire communications in question are those obtained from the wiretapping of defendant Corr's phone from September 15, 1981, to November 15, 1981. The trial court suppressed the products of the wiretap because the affidavit in support of the wiretapping evidence included toll record information. That affidavit, however, also included extensive informant, surveillance and other information.

 The affidavit was intended to establish that there was probable cause to believe that evidence would be obtained showing that felonious narcotics dealing had been or would be committed. Section 16–15–102(1)(a)(VI), C.R.S.1973 (1978 Repl. Vol. 8). This is analogous to the probable cause requirement for search warrants. *See* section 16–3–303, –304, C.R.S.1973 (1978 Repl.Vol. 8); Crim.P. 41. In *People v. Turner*, 660 P.2d 1284 (Colo.1983), we explained how an affidavit containing some constitutionally tainted evidence is to be evaluated in ruling on the validity of a search warrant issued on the basis of that affidavit:

> In analyzing a case in which there was an initial illegal search by the police followed by a search pursuant to a warrant, the court must determine whether the second search was tainted by the illegality of the first search. If there is clear and convincing evidence that the second search was conducted pursuant to a warrant based on information obtained before the illegal warrantless search, then the evidence would have been derived from a source independent of the initial illegality and should not be suppressed.... Therefore, we are required to determine whether the sufficiency of the affidavit submitted in support of the

**24.** Our holding is not based strictly on the distinction between investigators appointed by the Attorney General and investigators appointed upon motion of the grand jury pursuant to Crim.P. 6.5. We need not consider whether wholesale swearing in of Strike Force officers as grand jury investigators could effectively confer upon them the full powers of the grand jury, but it is clear that employment of grand jury subpoenas by police officers for the sole purpose of evading the search warrant requirement would constitute grand jury abuse.

request for the warrant ... clearly and convincingly establishes an independent basis for the ... search.

*Id.* at 1288 (footnote omitted); *see also People v. Montoya,* 44 Colo.App. 234, 616 P.2d 156 (1980). It appears that the trial court failed to consider whether the affidavit in support of the wiretap application would establish probable cause if the toll record information and derivative evidence were stricken.[25] Therefore, we reverse the suppression order and remand the case to the district court for further proceedings consistent with this opinion.

ERICKSON, C.J., dissents and ROVIRA, J., joins in the dissent.

ERICKSON, Chief Justice, dissenting:

I respectfully dissent from that part of the majority's opinion requiring that law enforcement officers obtain a search warrant supported by probable cause as a condition precedent to the obtaining of telephone toll call records for use as evidence. In my view, a telephone subscriber has no reasonable expectation of privacy in toll records.

In this case the toll records were obtained pursuant to a grand jury subpoena. Even if the majority is sound in its constitutional analysis of the requirements necessary for admission of the toll records at the time of trial, it would not extend to the use of the records before the grand jury. *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). I believe the evidence in issue should be admitted not only before the grand jury, but also as substantive evidence in trial of the issues framed in the indictment.

In determining whether a particular form of governmental electronic surveillance is a "search" within the meaning of the Fourth Amendment, we are guided by the United States Supreme Court decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Katz,* government agents intercepted the contents of a telephone conversation by attaching an electronic listening device to the outside of a public phone booth. The United States Supreme Court, in overruling *Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942), rejected the assertion that a "search" can only occur when there has been a physical intrusion into a "constitutionally protected area." *Katz* held that, since the government's monitoring of the conversation "violated the privacy upon which he justifiably relied while using the telephone booth," it "constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.* 389 U.S. at 351–353, 88 S.Ct. at 511–512.

This inquiry normally embraces a two-prong analysis:

"The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' ... whether, in the words of the *Katz* majority, the individual has shown that 'he seeks to preserve [something] as private.' ... The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize' as "reasonable," ' ...."

*Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

In *Smith v. Maryland,* the United States Supreme Court, applying the analysis articulated in *Katz,* held that a pen register does not constitute a search under the Fourth Amendment to the United States Constitution. In the view of the Court, individuals do not have a legitimate expec-

---

**25.** After ordering the toll records suppressed, the trial court continued, "[o]f course, that will cover the evidence that was later obtained from the wire taps [sic] as being part of the fruit of the poisonous tree doctrine." There are no conclusions in the record regarding the sufficiency of the wiretap affidavit minus the evidence derived from the toll records. Corr argues that this issue was not preserved for appeal because the prosecutor did not mention it immediately after the trial court's ruling, as shown by the transcript of the proceedings. However, the trial court's ruling was based on briefs that are not in the record, and there may be oral argument that is not in the record as well. The issue of sufficiency of the affidavit with the toll record evidence excised is raised in the prosecution's opening brief on appeal. Under these circumstances, we have elected to address it.

tation of privacy in the telephone numbers they dial. The Court found further that, even if there was a subjective expectation of privacy, that expectation was not reasonable.

Four years later, this court held in *People v. Sporleder*, 666 P.2d 135, 144 (Colo. 1983), under virtually identical factual circumstances:

> "[T]hat *Article II, section 7 of the Colorado Constitution provides a telephone subscriber with a legitimate expectation of privacy in the records of telephone numbers dialed,* that such material is protected from unreasonable searches and seizures, *that the installation of a pen register to record the numbers dialed constitutes a search,* that the acquisition by means of the pen register of the record of the numbers dialed constitutes a seizure, and that in the absence of exigent circumstances or consent law enforcement officers may not procure the installation of a pen register without first obtaining a search warrant supported by probable cause."

(Emphasis supplied.)

My dissent in this case is for substantially the same reasons that I set out in my dissent in *Sporleder*. Although I remain convinced that the Colorado Constitution must ultimately be interpreted by the Supreme Court of this state, I am uneasy with decisions of this court which reach a result different from the United States Supreme Court's interpretation of nearly identical language in the United States Constitution, particularly where, as in *Sporleder*, this court's rationale for departing from the Supreme Court's analysis of the Fourth Amendment in favor of an interpretation of Article II, section 7 of the Colorado Constitution is never plainly demonstrated.

An individual has an expectation of privacy in the content of a telephone conversation, but no expectation of privacy attaches to the specific number which has been dialed. "It is the content of a conversation which the Constitution protects and not the information necessary to make the telephone connection." *Sporleder*, 666 P.2d at

146 (Erickson, C.J., dissenting). The analysis applies with even greater force to toll records which document only those calls individually billed to the telephone subscriber.

When a person uses a telephone to make a toll call he knows that there will be a toll or charge incurred for the use of the phone. The calling number is billed on a monthly basis for toll calls reflected in the business records of the telephone company. Every person who uses a telephone expects to be billed for long distance calls and cannot reasonably invoke a claim that he has a right of privacy in the telephone records which reflect the toll calls he has made in a particular month.

In my view, the exclusionary rule should not be applied in this case because the law enforcement officers were acting with the reasonable belief that their conduct did not violate the constitutional rights of the defendant. *See* section 16–3–308(2)(b), C.R.S. 1973 (1978 Repl.Vol. 8 & 1983 Cum.Supp.). I believe that the Strike Force officers were acting in conformity with, and in reliance upon, the United States Supreme Court's decision in *Smith v. Maryland,* when they obtained the toll records and that their conduct constituted a "technical violation" under section 16–3–308(2)(b).

The majority opinion states that, since *Sporleder* "was explicitly based on and foreshadowed by *Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980)" (decided prior to the complained of conduct in this case), appellant's good faith reliance on *Smith v. Maryland* was misplaced. In *Charnes*, we held that an individual has a reasonable expectation of privacy in the *content* of his bank records. There, we emphasized that the substance of the requested bank records was a protected interest. We did not find, however, that the fact that there may or may not have been a financial transaction was a protected interest.

The majority's finding in this case necessarily requires of police officers a presci-

ence that eluded even the trial court judge.[1] The concept of privacy can be traced to the United States Supreme Court's development of Fourth Amendment jurisprudence. *Compare Goldman with Katz. See also Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). In my view, law enforcement officers are entitled to rely upon the decisions of our highest court, and should not have to anticipate that a federally guaranteed constitutional right will be given a broader interpretation under an all but identical provision in a state constitution. Address by Professor William Greenhalgh, Georgetown University Law Center, National Conference on Developments in State Constitutional Law (March 9, 1984). "I cannot think of a sounder basis for law enforcement officers to act upon than a decision of the United States Supreme Court." *Sporleder*, 666 P.2d at 152 (Rovira, J., dissenting). *See* section 16–3–308(2)(b), C.R.S.1973 (1978 Repl.Vol. 8 & 1983 Cum.Supp.); *Michigan v. Long*, —— U.S. ——, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (adopting a presumption against the existence of adequate and independent state grounds).

In my view, telephone subscribers have no legitimate expectation of privacy in toll records of the telephone company. I respectfully dissent.

I am authorized to say that Justice ROVIRA joins me in this dissent.

---

1. The record reveals that the trial court found initially that the toll records were legally obtained. Appellee then filed a motion to reconsider which was granted. The trial court, in reversing its earlier ruling, found:

"However, the Court finds that People v. Sporleder is controlling in this case. That is certainly a very restrictive case, particularly when we consider that it is, in effect, far broader than the United States Supreme Court decision.

*With that case decided, however, I feel that I must reverse my previous ruling, and will order that the evidence be suppressed."*

(Emphasis supplied.)