**The PEOPLE of the State of Colorado,
Plaintiff-Appellant,**

v.

**Linda J. TIMMONS, Patrick Allen Timmons, Timothy Edward Timmons, Jesse Gino Morris, William Otto Stoops, Defendants-Appellees.**

**No. 84SA49.**

Supreme Court of Colorado,
En Banc.

Oct. 22, 1984.

Robert L. Russel, Dist. Atty., Douglas S. Wamsley, Chief Deputy Dist. Atty., Clifford R. Cronk, Deputy Dist. Atty., Colorado Springs, for plaintiff-appellant.

John Randolph Torbet, Colorado Springs, for Linda J. Timmons.

Benjamin S. Waxman, Tegtmeier & Sears, P.C., Colorado Springs, for Patrick Allen Timmons.

Anthony F. Gonzales, Tampa, Fla., for Timothy Edward Timmons.

Patrick L. Dulaney, Aurora, for Jesse Gino Morris.

Howard Bittman, Boulder, for William Otto Stoops.

DUBOFSKY, Justice.

In this interlocutory appeal under C.A.R. 4.1, the People contest an El Paso County District Court order suppressing evidence gathered from telephone toll records, a pen register [1] and a wiretap, as well as all fruits thereof. We affirm the order of the district court.

Early in 1981, two confidential informants apprised Colorado Springs police officers that the defendants, Linda Timmons and James Vicars, were distributing large quantities of marijuana from their house at 14350 Holmes Road in El Paso County. According to the informants, Timmons and Vicars routinely recruited couriers to fly to Florida, pick up cars loaded with marijuana and drive back to Colorado. The Florida end of the operation, one informant stated, was under the direction of Timothy and Patrick Timmons.

Beginning in April 1981, Detectives Donald Kessler and C.R. Lucht of the Metro S.C.A.T. unit [2] mounted an undercover operation aimed at corroborating the informants' allegations. Posing as electricians, the officers were admitted to 14350 Holmes Road a number of times. While there, Detective Lucht saw a trash bag containing an estimated eight pounds of marijuana. He also noted that on one occasion an associate of Timmons and Vicars arrived with a leather pouch full of currency. In addition, a friend of Timmons and Vicars told Lucht that Vicars had once "fronted" drugs to another person.

Utilizing grand jury subpoenas, detectives from the S.C.A.T. unit also obtained the telephone toll records of Timmons and Vicars on at least three occasions during 1981 and 1982. These toll records were available to all officers working on the case and were never presented to the grand jury, although Detective Kessler testified as to their contents before the grand jury in December 1982, after the arrest of the defendants. Through these toll records, officers located and conducted surveillance of suspected conspirators, including Timothy and Patrick Timmons, in Florida and Ohio.

On August 23, 1982, with court authorization, officers of the S.C.A.T. unit installed a pen register on the telephone at 14350 Holmes Road. At the suppression hearing, all parties stipulated that the court authorization permitting installation of the pen register was not a search warrant or its equivalent and did not state a finding of probable cause.[3] The pen register operated continuously until October 12, 1982.

On that date, the El Paso County District Attorney applied under section 16–15–102, 8 C.R.S. (1978 and 1983 Supp.) for a court order permitting the interception of wire communications (wiretap) on the telephone at 14350 Holmes Road. In support of this application, the district attorney appended the affidavit of Detective Kessler, summarizing the information gathered from confidential informants, the undercover operation and the pen register. The affidavit also stated, and Detective Kessler acknowledged at the hearing, that the toll records were used in preparing the affidavit. The court approved a thirty-day wiretap, and subsequently extended its order for an additional thirty days.

On December 10, 1982, the same day the wiretap was terminated, search warrants were issued for the homes of Vicars, Linda

---

1. A pen register records the numbers dialed from a particular telephone and counts the number of incoming calls. It does not record or monitor conversations.

2. "Metro S.C.A.T." stands for Metropolitan Special Criminal Apprehension Team. This unit is composed of officers from the El Paso County Sheriff's office and the Colorado Springs Police Department.

3. The court order authorizing the pen register is not in the record before this court.

Timmons and William and Angela Stoops, as well as for Jesse Morris' automobile. Arrest warrants for Linda Timmons, Patrick Timmons, Timothy Timmons, Jesse Morris and William Stoops were also issued. The applications for all warrants were supported by the affidavit of Sergeant Daniel Shull, describing the contents of a number of intercepted phone calls and observations derived from surveillance of the suspects, and by the Kessler affidavit that had been used to obtain the wiretap.

On December 17, 1982, the defendants were indicted for conspiracy to possess marijuana for distribution,[4] possession of marijuana with intent to dispense,[5] and as special offenders.[6] Before trial, the defendants moved to suppress all evidence gathered through the use of the pen register and toll records. The district court[7] granted this motion, applying *People v. Sporleder*, 666 P.2d 135 (Colo.1983) retroactively[8] to suppress all pen register and toll record evidence[9] obtained without a search warrant, and holding that the statutory "good faith exception," § 16–3–308, 8 C.R.S. (1983 Supp.), did not apply. On this basis, the district court struck from the affidavit supporting the wiretap application all toll record and pen register information, along with all surveillance evidence derived from the toll records and pen register, and found that without this information the affidavit failed to establish probable cause; therefore, the court also suppressed all wiretap evidence. Finally, the district court suppressed evidence gathered from out-of-state surveillance and the residence and vehicle searches in Colorado, holding

that such evidence was the fruit of the wiretap, pen register and toll record evidence.

The People argue on appeal that the district court erred in applying *Sporleder* retroactively and in refusing to apply the statutory "good faith exception" to the pen register and toll record evidence. We reject both of these contentions and affirm the suppression order.

## I.

In *Sporleder* we held that the use of a pen register is a search and seizure under article II, section 7 of the Colorado Constitution, and that the installation of a pen register therefore must be preceded by the issuance of a search warrant. The district court, applying this rule retroactively to events that took place in 1981 and 1982, suppressed all toll record and pen register evidence. The People argue that the court erred in applying *Sporleder* retroactively.

In determining the retroactivity of a rule of criminal procedure, this court has consistently followed the lead of the United States Supreme Court. *See, e.g., People v. Hardin*, 199 Colo. 229, 607 P.2d 1291 (1980); *People v. Moreno*, 176 Colo. 488, 491 P.2d 575 (1971). Most recently, in *People v. Walker*, 666 P.2d 113, 117 (Colo. 1983), we adopted the retroactivity analysis set forth in *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967), which considers "(a) the purpose to be served by the new standards, (b) the extent of reliance by law enforcement authorities on the old standards, and (c) the

---

4. Sections 18–2–201, 8 C.R.S. (1978) and 18–18–106(8)(b) (1983 Supp.).

5. Section 18–18–106(8)(b), 8 C.R.S. (1983 Supp.).

6. Section 18–18–107, 8 C.R.S. (1983 Supp.).

7. The district court judge who suppressed the evidence was not the same judge who had authorized the use of the pen register and the wiretap.

8. The district court ruled that "[s]ince the issue arose prior to any conviction or trial the question of retroactivity does not arise." Despite the

inaccuracy of this proposition, the effect of the ruling was to apply *Sporleder* retroactively (*Sporleder* was decided after the pen register was installed and indictments obtained in this case), and that is how we treat the district court's ruling on appeal.

9. The district court applied *Sporleder* to the toll records as well as the pen register. Since that ruling, we explicitly have extended the reasoning of *Sporleder* to require a search warrant before police may obtain toll records. *People v. Corr*, 682 P.2d 20 (Colo.1984). The People do not challenge the prescience of the court's ruling on this issue.

effect on the administration of justice of a retroactive application of the new standards."[10] In *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), however, the United States Supreme Court abandoned this three-factor analysis in fourth amendment cases, holding instead that all new fourth amendment rulings shall be applied retroactively to all convictions that are not final at the time of the decision. The defendants now urge that we once again follow the United States Supreme Court and adopt the *Johnson* "bright line" approach in search and seizure cases, while the People suggest that application of the *Walker* analysis would defeat retroactivity in this case.

This case does not require us to choose between these two approaches. In *Johnson,* the Court noted that there are three categories of cases in which retroactivity rules have been firmly established by precedent, so that a court should apply neither the *Stovall* analysis nor the *Johnson* "bright line" approach. Among these categories is the situation in which the court "merely has applied settled precedents to new and different factual situations.... In such cases, it has been a foregone conclusion that the rule of the later case applies in earlier cases, because the later decision has not in fact altered the rule in any material way." *Johnson,* 457 U.S. at 549, 102 S.Ct. at 2587. We view *Sporleder* as falling within this category of cases.

*Sporleder* is one of a series of cases affirming that article II, section 7 of the Colorado Constitution protects the privacy of customers in institutional records. In *Charnes v. DiGiacomo,* 200 Colo. 94, 612 P.2d 1117 (1980), we held that customers retain a reasonable expectation of privacy in bank records of the customer's financial transactions. A customer does not intend to forfeit this expectation by opening a bank account, we reasoned, both because disclosure of information is incidental to the customer's main purpose, and because the use of banks is a business necessity and thus not entirely voluntary. In so finding, we rejected the contrary conclusion in *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), in which the Supreme Court held that customers have no reasonable expectation of privacy in bank records.

*Sporleder* explicitly extends the rationale of *DiGiacomo* to pen registers. Paralleling the reasoning of our earlier case, we found that telephone use is a necessity and that information supplied to the telephone company is merely incidental to that necessity; therefore, no voluntary forfeiture of privacy occurs when a telephone is used.[11] *Sporleder,* 666 P.2d at 141. We concluded that

> any difference between a bank customer's privacy interest in bank records and a telephone subscriber's privacy interest in a record of telephone numbers dialed from a house telephone is too insubstantial to justify a constitutional differentiation in treatment.

**10.** Quoting *Adams v. Illinois,* 405 U.S. 278, 280, 92 S.Ct. 916, 918, 31 L.Ed.2d 202 (1972), we also held in *Walker* that complete retroactivity is to be afforded any constitutional rule whose "major purpose ... is to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts...." 666 P.2d at 117–18. Contrary to the People's position in this appeal, such rules are not the only ones that may be applied retroactively; rather, such rules merely comprise one category of cases in which retroactivity has been afforded through application of the analysis set forth in *Walker* and *Stovall. See United States v. Johnson,* 457 U.S. 537, 548–49 n. 11,

102 S.Ct. 2579, 2586–87 n. 11, 73 L.Ed.2d 202 (1982).

**11.** *Sporleder* expands as well as adopts the rationale of *DiGiacomo.* We noted in *Sporleder,* for example, that the customer retains a subjective expectation that information imparted for business purposes will not be used also for police purposes. We also found that this expectation is objectively reasonable, inasmuch as government use of the information disclosed poses a risk to privacy far in excess of the risk posed by telephone company use of that same information. 666 P.2d at 141–42. This reasoning applies equally well to bank records and is consonant with the reasoning in *DiGiacomo.*

*Id.* at 143. As in *DiGiacomo*, our holding in *Sporleder* relied on the Colorado Constitution and rejected United States Supreme Court authority to the contrary. *Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

■ Thus, *Sporleder* and *DiGiacomo* both apply a single rationale to the problem of customer privacy in institutional records, and both rest solely and explicitly upon article II, section 7 of the Colorado Constitution.[12] It is for this reason that we have recently noted that *Sporleder* "was explicitly based on, and foreshadowed by, *Charnes v. DiGiacomo*", and that *Sporleder* therefore fell within that category of cases, delineated in *Johnson*, in which settled precedent is applied to a new factual situation. *People v. Corr*, 682 P.2d 20, 27 (Colo.1984). We reaffirm today that *Sporleder* basically applies the principles enunciated in *DiGiacomo*, and thus it properly was applied retroactively in this case.[13] We therefore affirm the district court's suppression of pen register and toll record evidence.

## II.

Section 16–3–308, 8 C.R.S. (1983 Supp.) provides:

(1) Evidence which is otherwise admissible in a criminal proceeding shall not be suppressed by the trial court if the court determines that the evidence was seized by a peace officer, as defined in section 18–1–901(3)(1), C.R.S., as a result of a good faith mistake or of a technical violation.

(2) As used in subsection (1) of this section:

. . . . .

(b) "Technical violation" means a reasonable good faith reliance upon a statute which is later ruled unconstitutional, a warrant which is later invalidated due to a good faith mistake, or a court precedent which is later overruled.

The People argue that the police reasonably relied in good faith upon *Smith v. Maryland*, permitting the warrantless use of pen registers, and could not realize that this reliance was misplaced until our decision in *Sporleder* was announced. Thus, they maintain, the evidence here was seized as a result of a "technical violation" and should be admitted under section 16–3–308.

■ Several months ago, we rejected this argument in *Corr*. There, we explained that *Sporleder* did not "overrule" *Smith;* to the contrary, *Sporleder* derived directly from *DiGiacomo*, which in turn was based upon article II, section 7 of the Colorado Constitution. *Corr*, 682 P.2d at 27. Given the existence of this independent state precedent, law enforcement authorities cannot have reasonably relied on *Smith*.[14] Section 16–3–308 is thus inapplicable to the search and seizure in this case.

**12.** In addition, the court in *DiGiacomo* explicitly noted that the rationale of the California case upon which its holding relied, *Burrows v. Superior Court of San Bernardino County*, 13 Cal.3d 238, 529 P.2d 590, 118 Cal.Rptr. 166 (1974), had been extended to cover telephone as well as bank records in *People v. Mejia*, 95 Cal.App.3d 828, 157 Cal.Rptr. 233 (1979). *DiGiacomo*, 200 Colo. at 99 n. 5, 612 P.2d at 1121 n. 5.

**13.** We ultimately held in *DiGiacomo* that constitutionally-protected bank records, in the context of an administrative matter, may be seized through a subpoena in place of a search warrant. The People contend that, because of this holding, *DiGiacomo* did not foreshadow our insistence in *Sporleder* that seizure of telephone records requires a search warrant. In *DiGiacomo*, however, we clearly held that governmental intrusion into bank records is a search and

seizure under article II, section 7 of the Colorado Constitution. A search and seizure requires different judicial authorization in varying contexts. Administrative searches may be conducted under authority of a subpoena, while police searches for evidence to be used in criminal proceedings require a search warrant supported by probable cause. *Oklahoma Press Publishing Company v. Walling*, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). Once a particular governmental intrusion has been designated a search and seizure in the constitutional meaning of those terms, it may be foreseen that a warrant will be required when the police, or a private institution at the request of the police, make the intrusion.

**14.** The S.C.A.T. unit, aided by the district attorney's office, deemed it necessary to obtain a court order prior to installation of the pen regis-

The order of the district court is affirmed.

ERICKSON, C.J., dissents, and ROVIRA, J., joins in the dissent.

ERICKSON, Chief Justice, dissenting:

I respectfully dissent.

## I.

When *Sporleder* was decided I dissented because, in my view, the use of a pen register does not implicate protectable interests under either the United States or Colorado Constitutions. I continue to believe that telephone users do not have a legitimate expectation of privacy in the numbers they dial. *See Smith v. Maryland*, 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *People v. Sporleder*, 666 P.2d 135, 144–48 (Colo.1983) (Erickson, C.J., dissenting). I also believe that, while the Colorado Constitution must ultimately be interpreted by the Supreme Court of Colorado, this court should not substantially depart from the decisions of the United States Supreme Court which interpret parallel language and provisions in the federal constitution involving the same or similar issues, without principled reasons for doing so. *See State v. Lowry*, 295 Or. 337, 667 P.2d 996 (1983) (Jones, J., specially concurring); Pollock, *State Constitutions as Separate Sources of Fundamental Rights*, 35 Rutgers L.Rev. 707 (1983).

In my view, when provisions of the Colorado Constitution closely parallel the federal constitution, or in areas in which state rules or statutes are enacted pursuant to or closely dovetail federal acts or policies, the decisions of the United States Supreme Court should be approached with deference. The area of electronic eavesdropping and wiretapping has been the subject of pervasive federal legislation. After extensive studies, Congress enacted Title III of the Omnibus Crime Control and Safe Streets Acts of 1968 (Title III), 18 U.S.C. § 2510 *et seq.*, which regulates the interception of certain wire and oral communications by both federal and state officials.

The federal statute provides latitude for state legislatures to enact legislation that is consistent with and which furthers the policies of Title III, and Colorado's statute governing electronic surveillance was in fact closely patterned after the federal act. *See* § 16–15–101 *et seq.*, 8 C.R.S. (1978). While the federal act does not directly apply to pen registers, *United States v. New York Telephone Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977), federal authorities which explain or interpret the policies underlying the various aspects of wiretapping should nevertheless be afforded greater weight and deference by states whose laws on the subject are largely the product of, and are designed to implement, federal policies.

Federal pronouncements, of course, cannot be dispositive of state issues in areas that are not fully preempted by the federal government. The state's own constitution, statutes, and policies provide adequate and independent grounds for legitimate divergencies from federal decisions. But this court should look only in exceptional circumstances to the state constitution when it elects to depart from precedent of the United States Supreme Court interpreting similar provisions of the federal constitution. A state court should attempt to carefully set forth reasons why it believes that state law or policy leads to a different result. *See, e.g., Right to Choose v. Byrne*, 91 N.J. 287, 450 A.2d 925 (1982) (divergence from Supreme Court precedent is justified because the text and history of the state constitution is more expansive

---

ter. Assuming that facts amounting to probable cause were indeed available to law enforcement authorities at that time, it would have been no more troublesome to obtain a search warrant than to obtain the court order. In *United States v. Johnson* the Court stated that "in light of the constitutional protection traditionally accorded to the privacy of the home, police officers should resolve any doubts regarding the validity

of a home arrest in favor of obtaining a warrant." 457 U.S. at 561, 102 S.Ct. at 2594. Given the strong judicial preference for searches conducted under the authority of warrants, *see, e.g., United States v. Ventresca*, 380 U.S. 102 at 106, 85 S.Ct. 741 at 744, 13 L.Ed.2d 684 (1965), any doubts regarding the validity of a search should likewise be resolved in favor of obtaining a warrant.

than the federal constitution and due to a pre-existing body of state law); *State v. Hunt*, 91 N.J. 338, 450 A.2d 952 (1982) (Handler, J., concurring) (structural differences between state and federal constitutions, matters of particular state concern, and state traditions justify a different result under the state's constitution).

## II.

Given this court's holding in *Sporleder*, I would nevertheless decline to apply the decision retroactively. In my view, the rationale of our decision in *Charnes v. DiGiacomo*, 200 Colo. 94, 612 P.2d 1117 (1980), does not necessarily extend to pen registers such that it is "a foregone conclusion that the rule of the later case applies in earlier cases, because the later decision has not in fact altered the rule in any material way." *United States v. Johnson*, 457 U.S. 537, 549, 102 S.Ct. 2579, 2587, 73 L.Ed.2d 202 (1982). Pen registers do not implicate the same interests that are involved in the disclosure of bank records, which was at issue in *Charnes*. As I stated by way of dissent in *Sporleder*:

> The pen register does not record the content of any conversation; it only records the number dialed. We emphasized in *Charnes* that the substance of the bank records sought was a protected interest, not the fact that there may or may not have been a financial transaction. The intrusion in *Charnes* into the substance of a person's economic life is much greater than the recording of telephone numbers which have been dialed.

666 P.2d at 147.

I view this case as falling squarely under *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). In *Linkletter*, the Supreme Court formulated a three-part test for resolving questions dealing with the retroactivity of new constitutional rules of criminal procedure. The test, as restated in *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199 (1967), requires a consideration of (1) the purpose to be served by the

new rule, (2) the extent of reliance by law enforcement authorities on the old standards, and (3) the effect on the administration of justice of a retroactive application of the new standards. *See also People v. Walker*, 666 P.2d 113 (Colo.1983).

As in *Linkletter*, I believe the rule announced in *Sporleder* does not affect the truthfinding process. The information obtained by a pen register is a business record that is generated contemporaneously with the use of a telephone and is not likely to be unreliable.[1] In addition, in the light of the differences between pen registers and the practices at issue in *Charnes*, and the clear standards applicable to pen registers announced in *Smith*, the police could have reasonably relied upon the Supreme Court's rule. In my view, the retroactive application of the new rule announced in *Sporleder* would not advance any of the policies underlying the exclusionary rule, and would only result in the suppression of relevant evidence. *See Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

I authorized to say that ROVIRA, J., joins me in this dissent.

---

1. In the present case, the information obtained from the pen register was used only to form the basis for obtaining a warrrant.