CHIEF JUSTICE COATS, dissenting.
¶65 Apart from my objections to much of the majority's selective and at times revisionist promenade through the history of both federal and state search and seizure law, I object specifically to its radical reconstruction, in the wake of our recent marijuana initiative, of the state's own constitutional Bill of Rights. Although the majority does its best to avoid addressing the issue, I believe the most significant aspect of its rationale today concerns the question of federal supremacy, the nature and scope of which may be more at issue today, in various contexts, than has been the case at any time in the last hundred and fifty years. Because I not only disagree with the majority's outcome here but also consider its reasoning both deeply flawed and likely to have implications far beyond this case, I respectfully dissent and briefly outline the more significant of my objections.
¶66 I must begin, however, by registering my emphatic objection to the majority's gratuitous and wholly unjustified assertion that our prior decisions had already effectively foreclosed the possibility that the alert of a trained drug detection dog alone can any longer provide probable cause of the presence of contraband and therefore probable cause of the commission of a crime. In both People v. Zuniga , 2016 CO 52, ¶ 30 n.6, 372 P.3d 1052, 1060 n.6, and People v. Cox , 2017 CO 8, ¶ 22 n.5, 401 P.3d 509, 514 n.5, we expressly reserved the question, finding its resolution unnecessary in those cases, where there were other grounds establishing probable cause to search in addition to or in conjunction with the dog alert. The majority's suggestion that an appellate court's choice among alternate rationales to resolve an assignment of error implicitly indicates that all other possible rationales would be inadequate bespeaks a fundamental misconception about appellate practice and precedent, if not simply language and logic. In any event, the majority rationale today is a far cry from simply finding that a dog's inability to distinguish among quantities of marijuana deprives its alert of the capability, in and of itself, of establishing probable cause to believe that more than an ounce of the drug is present.
¶67 Lest the wheat of the real issue of the case be lost amongst the chaff, I emphasize the question upon which the majority actually resolves this case, which I understand to be whether the state constitution has now not only legalized the possession of small amounts of marijuana by adults in the state but has in fact shrouded such possession with an expectation of privacy such that its detection by police investigation within the *415 territorial boundaries of this state amounts to the detection of "lawful" activity, despite the proscription of the very same activity as "unlawful" according to the coordinate federal criminal law. It seems clear that even the majority does not dispute the well-established proposition that the use of investigative techniques or devices, in this case a dog, capable of observing nothing more than activity that is unlawful, does not constitute a search within the contemplation of either the Fourth Amendment of the federal constitution or article II, section 7 of the state constitution. See Illinois v. Caballes , 543 U.S. 405, 408-09, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) ; People v. Esparza , 2012 CO 22, ¶ 11, 272 P.3d 367, 370. The specific wrinkle posed by our recent, popularly-initiated amendment to the state constitution is whether a dog sniff, despite being capable of exposing no more than the presence of federal contraband, nevertheless constitutes a search within the contemplation of the state constitution for the reason that it can detect the presence of a small amount of marijuana possessed by an adult, which is now lawful under state law.
¶68 In Coats v. Dish Network, LLC , 2015 CO 44, ¶ 20, 350 P.3d 849, 853, we addressed the similar question whether the General Assembly intended to extend the protections for "lawful" activities afforded by section 24-34-402.5, C.R.S. (2018), to activities made lawful under state law but remaining unlawful under federal law. We there concluded that the term "lawful" could not have been intended to include the possession of marijuana that remains "unlawful" under federal law, Coats , ¶ 20, 350 P.3d at 853, which in our federal system not only applies in this jurisdiction but, in the event of conflict, actually reigns supreme over state law. Today, the majority holds instead that a dog sniff capable of exposing the lawful presence of marijuana under state law, but no more than the possession of contraband-unlawful activity-under federal law, nevertheless constitutes a search within the contemplation of the state constitution, requiring probable cause and either a warrant or an exception thereto.
¶69 In the last half-century, the Supreme Court has come to construe the language of the Fourth Amendment protecting the "right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures," as intending to broadly protect any reasonable expectation of privacy whatsoever, see Katz v. United States , 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), which concept it has subsequently defined to include any subjective expectation of privacy that society is prepared to recognize as reasonable, California v. Ciraolo , 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986). Although without elaboration, on several occasions in the past, we apparently not only subscribed to this broad construction of the words "persons, houses, papers, and effects," by understanding article II, section 7 as similarly protecting any reasonable expectation of privacy but, in addition, accepted as reasonable certain expectations considered unreasonable by the Supreme Court. See Charnes v. DiGiacomo , 200 Colo. 94, 612 P.2d 1117, 1121 (1980) (finding reasonable expectation of privacy and therefore protection under the state constitution for records in the hands of banks); see also People v. Oates , 698 P.2d 811, 818-19 (Colo. 1985) (same for purchase of drug precursors); People v. Corr , 682 P.2d 20, 27 (Colo. 1984) (same for phone records); People v. Sporleder , 666 P.2d 135, 144 (Colo. 1983) (same for numbers of incoming phone calls detected by pen register). Today, following its paean to separate reliance on state constitutions, the majority construes our constitution, in conjunction with the regulatory framework created for its implementation, as not only decriminalizing the possession of small amounts of marijuana but also as reflecting a state policy adopting the proposition that an adult's subjective expectation of privacy in his possession of an amount of marijuana legal under state law must be considered objectively reasonable, with the effect that in Colorado such an individual is held to have a reasonable expectation of privacy in the commission of federal crime. Not only do I not share this view of state law as designating such a subjective expectation of privacy reasonable, but perhaps even more importantly, I do not share the majority's view that the marijuana amendments and regulations upon which it relies were intended to alter our *416 prior interpretation of article II, section 7 with regard to the use of investigative techniques capable of detecting no more than unlawful activity.
¶70 Initially, I consider thoroughly unpersuasive the majority's patchwork of conclusory propositions in support of its conclusion that Amendment 64 not only legalized certain activities related to marijuana but in fact "expanded the protections of article II, section 7 to provide a reasonable expectation of privacy to engage in the lawful activity of possessing marijuana in Colorado." Maj. op. ¶ 42. The amendment, of course, does not cross-reference the constitutional search and seizure provision at all; does not in any way allude to an expectation of privacy in the possession of marijuana, much less a reasonable expectation of privacy in violating federal law; and does not remotely suggest the imposition of any restriction on state executive branch officers from detecting federal crime. Furthermore, the sole reference to "individual privacy" mentioned by the majority is limited to an express prohibition against the promulgation of regulations mandating the collection of personal data by retailers as a precondition to sale. Maj. op. ¶ 41.
¶71 Even if it were plausible to construe our regulatory scheme as intending to create a special expectation of privacy in the possession of marijuana, as does the majority, however, I can perceive nothing (and the majority offers nothing) in that construction requiring us to alter the calculus governing our decision in Coats . Just as in Coats , ¶ 20, 350 P.3d at 853, the question upon which the majority's ultimate holding turns is whether the possession of marijuana can be considered "lawful" activity in this context, despite its continued proscription as criminal by federal law-law which also governs this jurisdiction. In this regard, I consider the majority's reliance on a separate state constitutional expectation of privacy in the possession of marijuana to be superfluous, in no way rendering the possession of federal contraband in the state "lawful."
¶72 In particular, the majority notes a line of cases decided more than thirty years ago in which we held as a matter of state constitutional law that an individual does not abandon a reasonable expectation of privacy simply by exposing otherwise private information to third parties no more than is necessary to participate and conduct business in the modern world. See Oates , 698 P.2d at 818-19 (exposing the purchase of drug precursors to the chemical wholesaler); Corr , 682 P.2d at 26-27 (exposing numbers of outgoing calls to phone company); Sporleder , 666 P.2d at 144 (exposing numbers of incoming calls to phone company); DiGiacomo , 612 P.2d at 1121 (exposing banking transactions to the bank). While there can be no question that states may, and when appropriate should, afford even greater protections to their citizenry than those already afforded by the federal Bill of Rights, see Curious Theatre Co. v. Colo. Dep't of Pub. Health & Env't , 220 P.3d 544, 551 (Colo. 2009), by the same token states are clearly not empowered to enact laws that conflict with federal law, see Wyeth v. Levine , 555 U.S. 555, 563, 129 S.Ct. 1187, 173 L.Ed.2d 51 (2009). Nor have we ever suggested anything of the sort. Unless the majority intends to equate affording protections beyond those rights already afforded under the federal Bill of Rights with affording protections for violating federal law, I fail to see how its discussion of our past reliance on state constitutional grounds in any way advances its analysis. Unlike the majority, I do not believe the language of the marijuana initiative, even when considered in conjunction with other constitutional or statutory provisions, can be understood to recognize a reasonable expectation of privacy in committing federal crime, and I consider it clear that this court has never, for obvious reasons, interpreted article II, section 7 to sanction any such expectation.
¶73 Beyond extending in this way, without acknowledgement or justification of any kind, the effect of reliance on state constitutional grounds, the majority also overturns long-accepted precedent of the jurisdiction, similarly without acknowledgement or justification of any kind, by announcing, ex cathedra , that we now will "embrace[ ] the exclusionary rule as a remedy for violations of article II, section 7." Maj. op. ¶ 61. Although, as the *417 majority indicates, we have on several occasions in the past affirmed suppression orders of lower courts as the result of violations of expectations of privacy recognized as reasonable solely under the state constitution, see Oates , 698 P.2d at 812 ; Corr , 682 P.2d at 22 ; Sporleder , 666 P.2d at 136, we have never suggested the existence of a separate exclusionary rule for violation of the state constitution. Whether the absence of any justification for adopting the suppression orders in those cases reflects an assumption that the exclusionary remedy adopted by the Supreme Court would require the suppression of an unjustified infringement on any reasonable expectation of privacy, regardless of its source, or reflects simply the absence of any express challenge to the affirmance of the lower courts' exclusionary orders, it is clearly substantially more problematic, even to the majority, to order the exclusion of evidence for violation of a state-recognized expectation of privacy in committing federal crime, without expressly resting that remedy in state law.
¶74 The last time this court expressly considered the question whether our constitutional guarantee against unreasonable searches implied its own exclusionary remedy, we firmly rejected that proposition. See Wolf v. People , 117 Colo. 279, 187 P.2d 926, 927-28 (1947), aff'd , Wolf v. Colorado , 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), overruled by Mapp v. Ohio , 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (concerning the applicability in state criminal proceedings of the exclusionary rule adopted in Weeks v. United States , 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), for evidence seized in violation of the Fourth Amendment). While we expressly rejected any exclusionary rule of evidence for violation of article II, section 7 in Wolf , this was not the only or first time we did so, see Roberts v. People , 78 Colo. 555, 243 P. 544, 559 (1926); Massantonio v. People , 77 Colo. 392, 236 P. 1019, 1021 (1925), and we continued to reject the exclusion of evidence for violation of constitutional search provisions until ordered to apply the Fourth Amendment exclusionary rule in Mapp , see Williams v. People , 136 Colo. 164, 315 P.2d 189, 191 (1957).
¶75 This court first rejected exclusion as a remedy for a violation of article II, section 7 in Massantonio , 236 P. at 1021, largely reasoning that the rule in Weeks was fundamentally flawed because the Fourth Amendment violation occurs when the illegal seizure happens, not when the evidence is used at trial; because there is nothing about the constitutional violation itself that renders the evidence incompetent; and because the rule contradicted the fundamental principle accepted at law that an illegality in the mode of procuring evidence is no ground for excluding it. We reaffirmed Massantonio in Roberts , 243 P. at 559, noting that the exclusionary rule had been rejected "after a thorough examination of all the available authorities and a careful consideration of the alleged reasons supporting each." Roberts also noted that, in addition to the logical errors made by the rule, it also lacked policy justification because it could, for instance, allow "one unquestionably guilty of an atrocious murder" to be "turned loose." Id.
¶76 In the absence of offering any rationale or justification for reversing course and now adopting an exclusionary remedy for violation of article II, section 7, the majority necessarily offers no hint about the nature and applicability of its new rule, beyond the fact that it will require the suppression of the meth pipe discovered in this case. Even the federal exclusionary rule itself is no longer a bright-line rule of automatic exclusion, having now been declared "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Calandra , 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). In the ensuing years, the Supreme Court has expressly recognized a host of limitations and exceptions to exclusion, including the inapplicability of the rule in whole classes of proceedings, see Stone v. Powell , 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (habeas corpus proceedings); United States v. Janis , 428 U.S. 433, 459-60, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976) (civil proceedings); Calandra , 414 U.S. at 354, 94 S.Ct. 613 (grand jury proceedings); its inapplicability to the fruits of an unlawful search under *418 various circumstances, see Nix v. Williams , 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (inevitable discovery); Silverthorne Lumber Co. v. United States , 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920) (independent source); and even its ineffectiveness where otherwise applicable, see Herring v. United States , 555 U.S. 135, 137, 147, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (negligence as to accuracy of active warrants); Hudson v. Michigan , 547 U.S. 586, 594, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (violations of knock-and-announce rule); Arizona v. Evans , 514 U.S. 1, 12-14, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995) (clerical errors); United States v. Leon , 468 U.S. 897, 918-21, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (good faith execution of defective warrants). In addition, the Supreme Court has made clear that even where no specific exception has been recognized, the rule may not apply if its potential deterrent benefits do not merit its costs. Herring , 555 U.S. at 140, 129 S.Ct. 695 (citing Hudson , 547 U.S. at 591, 126 S.Ct. 2159 ). Whether the new Colorado rule will follow the continuing evolution of the federal rule, or whether it will simply become another vehicle for disagreeing with the Supreme Court or providing insulation from its review, for now must apparently remain a mystery.
¶77 The legal justification for, or even policy benefits of, adopting an exclusionary rule as a means of modifying executive branch behavior having no impact on the competence of the evidence itself is hardly self-evident or a matter to be casually decided without vigorous debate. Both sides of the political spectrum have argued against the use of the federal exclusionary rule, despite its having been in existence for more than a century. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule , 1999 U. Ill. L. Rev. 363, 365-66 (1999) (arguing that exclusion is appropriate only for flagrant violations and that monetary liability for individual officers and police departments would better deter Fourth Amendment violations); Patrick Tinsley, N. Stephan Kinsella & Walter Block, In Defense of Evidence and Against the Exclusionary Rule: A Libertarian Approach , 32 S.U. L. Rev. 63, 72 (2004) (arguing that removing exclusionary rule and instead allowing for damages suits would be more effective and would allow non-criminal victims of Fourth Amendment violations to have a remedy); see also Janis , 428 U.S. at 448-53, 96 S.Ct. 3021 (discussing difficulties in evaluating deterrence).
¶78 In addition, a number of substantial arguments have arisen specifically against the adoption of separate state constitutional exclusionary rules. See, e.g. , Paul G. Cassell, The Mysterious Creation of Search and Seizure Exclusionary Rules Under State Constitutions: The Utah Example , 1993 Utah L. Rev. 751, 756-58 (1993) ; Robert M. Pitler, Independent State Search and Seizure Constitutionalism: The New York State Court of Appeals' Quest for Principled Decisionmaking , 62 Brook. L. Rev. 1, 174-80 (1996). Pitler articulates a number of objections to a judicially created exclusionary rule by New York's highest court, including 1) various arguments raised against such a rule at one of New York's constitutional conventions, 2) precedent refusing to recognize an exclusionary rule, 3) common law evidentiary principles that reliable evidence should be admitted to further the truth-finding process, and 4) the inherently policy-based nature of the rule. Pitler, supra , at 174-75. Focusing on Utah's judicially created exclusionary rule, Cassell also provides a useful framework from which courts might analyze the question whether exclusion is an appropriate remedy under a state constitution, arguing essentially that state courts are obliged to begin by considering the intent of the framers of their own constitution's search and seizure provision, through traditional constitutional precepts of interpretation. Cassell, supra , at 757. Equally applicable to the question in this jurisdiction is his admonition that state courts must also consider whether an exclusionary rule is consistent with the state's separation of powers doctrine and rules of evidence, as well as whether such a rule would be sound from a state public policy perspective. Id. Finally, the availability and effectiveness of other remedies for search and seizure violations cannot be discounted in any meaningful assessment. Id. at 758.
¶79 Similarly, state high courts, including this court in particular, have been cautioned in adopting an exclusionary rule to avoid *419 tying themselves too tightly to the federal rule as applied by the Supreme Court, given the haphazard and inconsistent evolution of that rule. See Michael K. Schneider, An Exclusionary Rule Colorado Can Call Its Own , 63 U. Colo. L. Rev. 207, 208 (1992) ; see also Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law 42-83 (2018) (recounting the development of the federal exclusionary rule and encouraging state courts not to assume federal courts can best protect the constitutional rights of criminal defendants). Having done so itself, at least one state high court cautions that whatever process a state court uses to adopt or reject a state exclusionary rule, at the very least it should consider basic questions: 1) What is the basis of the rule-is it a constitutional right, merely a judicial remedy, or constitutionally compelled?; 2) What are the purposes behind the rule-deterrence alone or something else?; and 3) Who is meant to be deterred-police only or other persons in the criminal justice system? See State v. Larocco , 794 P.2d 460, 473 (Utah 1990) (plurality opinion) (adopting state exclusionary rule); see also Sanford E. Pitler, The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy , 61 Wash. L. Rev. 459, 460 (1986) (finding that state courts typically justify an exclusionary rule of evidence as a separate constitutional right, as a judicially created remedy, or as compelled by the applicable constitutional provision).
¶80 Beyond what I consider to be its logical flaws, legal misinterpretations, and intemperate extensions of state constitutional doctrine, however, I am particularly concerned that in going to such lengths to craft a rationale for imposing limitations on the use of drug detection dogs, the majority unwittingly exposes not only the marijuana initiative itself but even the state's constitutional Bill of Rights to a much greater risk of federal preemption than would previously have been the case. Whether or not the legalization and regulation of marijuana and the majority's construction of the state's Bill of Rights in the wake of those actions are of a piece, such that the majority's resolution today could in any way have been anticipated, I do not consider it appropriate, or wise, to sidestep what I believe to be the most significant impediment to the majority's rationale. While resting a decision solely on state grounds may generally be an effective technique for insulating state courts from further federal review, that is clearly not the case with regard to the supremacy of federal law.
¶81 Any federal system of government must of course have some strategy for dealing with conflicts between the national and local governments, and the framers of our federal constitution embodied their choice of strategy in the Supremacy Clause, U.S. Const. art. VI, cl. 2. Although the rules developed by the Supreme Court for determining the existence of an irreconcilable conflict requiring resolution in favor of federal law may be complex and at times unclear, even before today's construction we had found at least a portion of Amendment 64 to be preempted by federal law. See People v. Crouse , 2017 CO 5, ¶ 19, 388 P.3d 39, 43. Whether the recent marijuana law, on its face or as construed to impact article II, section 7, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," Hines v. Davidowitz , 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941) ; see also People v. Crouse , 2013 COA 174, ¶ 91, 412 P.3d 599, 616 (Bernard, J., concurring in part and dissenting in part), rev'd , 2017 CO 5, 388 P.3d 39, appears to be a question that will have to wait for another day, but I believe that after today, that question cries out for resolution more than ever before.
¶82 Because I believe that a straightforward application of Zuniga and Esparza require that the trial court's denial of the motion to suppress be affirmed, I would reverse the judgment of the court of appeals.
¶83 I therefore respectfully dissent.
I am authorized to state that JUSTICE BOATRIGHT and JUSTICE SAMOUR join in this dissent.